No. 20-1992

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| DEMETRIUS ROSS, KEVIN HAMILTON, RONALD SMITH, JONATHAN TOLLIVER, and GLENN VERSER, on behalf of themselves and a class of others similarly situated, | ) ) ) ) | On Appeal from the United States District Court for the Southern District of Illinois |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| SALVADOR GODINEZ, JOSEPH YURKOVICH, MICHAEL ATCHISON, DAVID WHITE, ANTHONY McCALLISTER, JERRY WITTHOFT, FRANK EOVALDI, ROBERT ARNETT, BRIAN PIPER, DAVID HERMETZ, CHRIS WHITE, KEN FINNEY, MICHAEL GILREATH, TIMOTHY McCALLISTER, KIM BUTLER, ALEX JONES, GREG GOSSETT, STEPHANIE DORETHY, ZACHARY ROECKEMAN, ROBERT CRAIG, STEPHEN DUNCAN, and RICHARD MOORE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 15-cv-309-SMY-MAB




The Honorable STACI M. YANDLE, Judge Presiding. |
| | ) | |
| Defendants-Appellants. | ) | |

## BRIEF AND SHORT APPENDIX OF DEFENDANTS-APPELLANTS

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**SARAH A. HUNGER**
Deputy Solicitor General

**KAITLYN N. CHENEVERT**
**KATELIN B. BUELL**
Assistant Attorneys General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2127
kchenevert@atg.state.il.us

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellants

# TABLE OF CONTENTS

*Page(s)*

TABLE OF AUTHORITIES ..............................................................................ii

JURISDICTIONAL STATEMENT ................................................................ 1

ISSUE PRESENTED FOR REVIEW.............................................................. 4

STATEMENT OF THE CASE ......................................................................... 5

SUMMARY OF ARGUMENT ..................................................................... 16

ARGUMENT ............................................................................................... 18

I.  The abuse of discretion standard of review applies here. ............... 18

II. The district court abused its discretion when concluding that plaintiffs satisfied the commonality, typicality, and predominance requirements for class certification. ............................................................................ 18

   A.  Plaintiffs did not carry their burden to establish Rule 23(a)(2)'s commonality requirement because they failed to marshal significant proof that defendants' 2014 shakedown policy existed as they alleged that it did. ............................ 20

   B.  Plaintiffs failed to meet Rule 23(a)(3)'s typicality requirement because they did not show that the representative plaintiffs' claims were typical of the proposed class members' claims. .................................................................... 27

   C.  Plaintiffs also failed to satisfy Rule 23(b)(3)'s demanding predominance requirement. .................................................................................................. 28

CONCLUSION............................................................................................ 36

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Ajala v. Tom,*
  658 F. App'x 805 (7th Cir. 2016) ............................................................. 31

*Amchem Prod., Inc., v. Windsor,*
  521 U.S. 591 (1997) ................................................................................. 29

*Andrews v. Chevy Chase Bank,*
  545 F.3d 570 (7th Cir. 2008) ................................................................... 35

*Arreola v. Godinez,*
  546 F.3d 788 (7th Cir. 2008) ............................................................. 19, 21

*Beaton v. SpeedyPC Software,*
  907 F.3d 1018 (7th Cir. 2018) ........................................................... 19, 26

*Bell v. PNC Bank, National Association,*
  800 F.3d 360 (7th Cir. 2015) ....................................................... 24, 25, 26

*Blyden v. Mancusi,*
  186 F.3d 252 (2d Cir. 1999) .............................................................. 32, 33

*Butler v. Sears, Roebuck & Co.,*
  727 F.3d 796 (7th Cir. 2013) ....................................................... 32, 34, 35

*Chavez v. Ill. State Police,*
  251 F.3d 612 (7th Cir. 2011) ............................................................. 18, 33

*Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.,*
  797 F.3d 426 (7th Cir. 2015) ....................................................... 16, 18, 20

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ............................................................................. 19, 29

*Daugherty v. Page,*
  906 F.3d 606 (7th Cir. 2018) ................................................................... 33

*DeWalt v. Carter,*
  224 F.3d 607 (7th Cir. 2000) ................................................................... 30

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ................................................................ 30

*Espenscheid v. DirectSat USA, LLC*,
705 F.3d 770 (7th Cir. 2013) .................................................. 34

*Fillmore v. Page*,
358 F.3d 496 (7th Cir. 2004) .................................................. 31

*Gill v. City of Milwaukee*,
850 F.3d 335 (7th Cir. 2017) .................................................. 33

*Gillis v. Litscher*,
468 F.3d 488 (7th Cir. 2006) .................................................. 30

*Harper v. Sheriff of Cook County*,
581 F.3d 511 (7th Cir. 2009) ............................................ 32, 35

*Hudson v. McMillian*,
503 U.S. 1 (1992) ............................................................ 30, 32

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) .................................................. 32

*Jamie S. v. Milwaukee Public School*,
668 F.3d 481 (7th Cir. 2012) .................................................. 23

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) (internal quotations omitted) ................................. 27

*Kleen Prod. LLC v. Int'l Paper Co.*,
831 F.3d 919 (7th Cir. 2016) .................................................. 34

*Kohen v. Pacific Investment Management Company LLC*,
571 F.3d 672 (7th Cir. 2009) .................................................. 26

*Kress v. CCA of Tennessee, LLC*,
694 F.3d 890 (7th Cir. 2012) ............................................ 18, 28

*Lunsford v. Bennett*,
17 F.3d 1574 (7th Cir. 1994) .................................................. 30

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .................................................. 29

iii

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ........................................ 34

*Parko v. Shell Oil Co.*,
    739 F.3d 1083 (7th Cir. 2014) ...................................... 31

*Phillips v. Sheriff of Cook County*,
    828 F.3d 541 (7th Cir. 2018) ........................................ 23

*Polzin v. Ericksen*,
    607 F. App'x 572 (7th Cir. 2015) ................................. 31

*Priddy v. Health Care Serv. Corp.*,
    870 F.3d 657 (7th Cir. 2017) ................................... 19, 20

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) ............................................ 28

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ...................................... 27

*Savory v. Cannon*,
    947 F.3d 409 (7th Cir. 2020) ........................................ 30

*Simer v. Rios*,
    661 F.2d 655 (7th Cir. 1981) ........................................ 30

*Suchaneck v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ........................................ 35

*Szabo v. Bridgeport Machs., Inc.*,
    249 F.3d 672 (7th Cir. 2001) ................................... 19, 26

*Teamsters v. United States*,
    431 U.S. 324 (1977) ...................................................... 22

*Tibbs v. City of Chi.*,
    469 F.3d 661 (7th Cir. 2016) ........................................ 31

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ................................................. 29

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................. passim

## Statutes

28 U.S.C. § 1331 ..................................................................................... 1

28 U.S.C. § 1367 ..................................................................................... 1

42 U.S.C. § 15607 ................................................................................... 1

42 U.S.C. § 1983 ..................................................................................... 1

## Constitutional Provisions

Eighth Amendment to the United States Constitution ............................... 1

## Rules

Fed. R. App. P. 5(a)(2) ............................................................................ 3

Fed. R. Civ. P. 23(a) ............................................................................. 18

Fed. R. Civ. P. 23(b)(3) ......................................................................... 19

Fed. R. Civ. P. 23(f) ............................................................................... 3

# JURISDICTIONAL STATEMENT

On October 31, 2016, Plaintiffs-Appellees Demetrius Ross, Jonathan Tolliver, Kevin Hamilton, Glen Verser, and Ronald Smith[1] filed a second amended complaint, which is the operative one in this case, naming more than 500 defendants.  Doc. 197 at 1-7.[2]  That complaint was filed on behalf of plaintiffs and all other similarly situated inmates in the custody of the Illinois Department of Corrections ("Department") at Illinois River, Menard, Big Muddy, and Lawrence Correctional Centers who were subject to shakedowns of their prison cells by Department tactical team officers in 2014.  *Id*. at 12-13.

The complaint was brought under 42 U.S.C. § 1983, and plaintiffs claimed that the cell shakedowns violated the Eighth Amendment to the United States Constitution because the shakedowns were designed to inflict pain and humiliation. (*Id*. at 13, 37-40).  Plaintiffs also asserted conspiracy and failure to intervene claims under the Eighth Amendment, a claim under the Prison Rape Elimination Act, 42 U.S.C. § 15607, and a state law claim for intentional infliction of emotional distress. *Id*. at 40-50.  The district court had subject matter jurisdiction over the federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

---

[1]  Zachary Watts and James Dunmore were also named plaintiffs in the second amended complaint, but they did not request to be appointed class representatives.

[2]  The record on appeal, which is the district court docket, is cited as "Doc. __ at __." The short appendix to this brief is cited as "A__."

On March 7, 2016, the district court consolidated *Williams v. Mull*, S. Dist. Ill. No. 15-cv-523, into this case. Doc. 90. Salvador Godinez was a named defendant in the *Williams* case, S. Dist. Ill. No. 15-cv-523, Doc. 19 at 2, and thus became a defendant in this case. The district court also consolidated several other cases into this case. *See* Docs. 90, 93, 102, 114, 137, 139, 185, 259; 3/2/16 minute entry; 3/17/16 order; 3/20/17 order; 4/4/17 text order.

On October 10, 2018, plaintiffs moved for class certification, seeking to certify a class of inmates incarcerated at: Menard from April 4-16, 2014; Illinois River from April 21-29, 2014; Big Muddy from May 12-19, 2014; and Lawrence from July 7-11, 2014. Doc. 481 at 23. Plaintiffs moved to certify claims against only Defendants-Appellants (hereinafter "defendants")—22 Department employees in supervisory roles during the shakedowns that occurred at these facilities on these dates. *Id.* at 19-26. On March 25, 2019, the district court severed *Williams* from this case because *Williams* involved a shakedown that occurred at Pinckneyville Correctional Center. Doc. 507 at 2; Doc 508. Godinez remained a defendant in this case because before the district court severed *Williams*, he was added as a defendant in plaintiffs' second amended complaint, *see* Doc. 197 at 6, and because he was a named defendant in other cases that remained consolidated with this case. *See Tolliver v. Godinez*, S. Dist. Ill. No. 15-cv-523, Doc. 102; *Smith v. Godinez*, S. Dist. Ill. No. 16-cv-248, Doc. 114.

On March 26, 2020, the district court granted class certification, certifying a class of inmates as proposed in plaintiffs' motion. (Doc. 519 at 12-13). The district

court did not specify against whom the class was certified, but noted that plaintiffs sought a class against only the "administrative defendants." (*Id*. at 4 n.2).

On April 9, 2020, defendants filed a petition in this court for permission to appeal the district court's March 26, 2020 order granting plaintiffs' motion for class certification, which was docketed as case No. 20-8011. This petition was timely because it was filed within 14 days of the district court's order. *See* Fed. R. Civ. P. 23(f). On June 4, 2020, this court granted the petition. 7th Cir. App. No. 20-8011, Doc. 14. On June 10, 2020, this court entered this appeal on its general docket as No. 20-1992. This court has jurisdiction over this permissive appeal, No. 20-1992, under Fed. R. App. P. 5(a)(2) and Fed. R. Civ. P. 23(f).

## ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion when it certified a class of nearly 10,000 inmates who each experienced a shakedown at one of four different Illinois prisons, where plaintiffs failed to meet their burden under Rule 23 to establish commonality, typicality, and predominance.

## STATEMENT OF THE CASE

Plaintiffs filed this action in 2015, alleging in their operative complaint that defendants conducted unconstitutional shakedowns at four Department facilities. In 2018, following more than two years of discovery, plaintiffs moved to certify a class of nearly 10,000 inmates based on inconsistent anecdotal evidence from less than 1% of the proposed class. Defendants objected, noting that plaintiffs' evidence failed to satisfy Rule 23's commonality, typicality, and predominance requirements. The district court, however, granted plaintiffs' motion and certified a class. Shortly thereafter, defendants filed a Rule 23(f) petition, which this Court granted.

**Plaintiffs' operative second amended complaint**

In 2016, plaintiffs filed a second amended complaint—the operative one in this case—alleging that defendants violated their constitutional and statutory rights. Specifically, plaintiffs alleged that beginning in April 2014, Department tactical team officers conducted shakedowns of inmates' cells at Illinois River, Menard, Big Muddy River, and Lawrence Correctional Centers. Doc. 197 at ¶¶ 40, 57. According to plaintiffs, these shakedowns were conducted in the same manner at each facility pursuant to a "policy or practice implemented, overseen, and encouraged by [Department] supervisors, including Defendants Yurkovich, Gossett, Roeckeman, Duncan, and Butler, among others." *Id.* at ¶ 58.

According to plaintiffs, the Department's tactical team entered the inmates' living spaces loudly; directed inmates to engage in a "reverse" strip search by ordering them to manipulate their genitals and buttocks and then put their hands in their mouths; used derogatory and offensive language; handcuffed inmates in an

"unnecessarily painful" manner, with their hands behind backs and palms facing out; directed inmates to wear a shirt, pants, and shoes but no underwear; marched inmates to a holding area in a "nuts to butts" fashion, such that inmates' genitals touched the inmate in front of him; subjected inmates to excessive force; and required inmates to wait in uncomfortable "stress positions" for several hours while their cells were searched. *Id.* at 29-34. Plaintiffs asserted Eighth Amendment, conspiracy, failure to intervene, intentional infliction of emotional distress, and statutory claims. Doc. 197 at 37-45.

**Plaintiffs' motion for class certification and defendants' opposition**

Plaintiffs moved for class certification, asserting that questions existed that would be resolved "with evidence common to the entire class." Doc. 481 at 29. In support of their motion, plaintiffs tendered evidence from 82 of the 9,871 proposed class members in the form of 49 inmate declarations, Doc. 481-49; 14 inmate video interviews, Doc. 481-50-63; and 19 inmate deposition transcripts, Doc. 481-29-47. Ten of the 82 were inmates at Illinois River, 17 at Big Muddy, 21 at Lawrence, and 34 at Menard. Doc. 481-29-47, 49-63. Defendants objected to plaintiffs' motion and presented their own evidence, including 28 additional inmate interviews and 1 deposition transcript, bringing the total inmate accounts to 111. Doc. 491-1, 491-7. The parties' evidence in support of an opposing class certification showed the following.

Defendants offered evidence that, in 2014, the Department decided to conduct facility-wide shakedowns with the goal of locating and confiscating contraband. Docs. 481-6 at 31:14-32:2, 45:21-46:10; 481-16 at 101:17-23, 103:19-22; 481-18 at

125:9-11.  By searching an entire facility at once, the Department could be more thorough and prevent inmates from passing contraband to one another during the searches.  Docs. 481-16 at 304:14-305:3; 481-18 at 66:5-10; 481-20 at 25:15-26:12; 481-26 at 50:4-51:12.  Facility-wide shakedowns were conducted by the Department's tactical team, which consisted of specially trained officers, because each facility on its own did not have enough staff to search the whole facility at once.  Docs. 481-6 at 32:13-33:5; 481-16 at 43:11-19, 44:18-21; 481-20 at 25:19-26:1.

The plan for each shakedown was memorialized in an Operations Order. Docs. 481-6 at 54:3-23; 481-7 at 33:14-22; 481-66.  Command staff expected tactical team officers to follow the Operations Order, as well as Department policies and training.  Doc. 481-16 at 148:16-150:13, 153:13-18; 481-20 at 53:16-21.  Before each shakedown, command staff briefed the tactical team officers, instructing them to act safely and professionally and to treat inmates with respect.  Docs. 481-6 at 35:5-13; 481-16 at 146:3-148:9, 153:3-10; 481-17 at 138:6-24, 140:19-141:7, 192:8-193:12; 481-18 at 57:11-58:6, 60:21-61:7; 481-20 at 51:12-22; 481-26 at 32:22-33:14.

During each shakedown, tactical team officers entered the inmates' living areas loudly, including by banging batons on cell bars.  Docs. 481-7 at 141:4-17; 481-17 at 206:15-207:8.  Department policy authorized this practice, which served to awaken sleeping inmates, and created an element of surprise so that inmates did not have time to hide contraband.  Docs. 481-7 at 141:4-17; 481-17 at 206:21-207:8. Using offensive or derogatory language, however, would have been against

Department policy.  Docs. 481-6 at 132:13-16; 481-16 at 271:1-6, 271:24-272:3; 481-17 at 156:11-159:1.

Inmates were strip searched in their cells.  Docs. 481-20 at 68:24-69:18; 481-26 at 43:24-44:1.  Department policy required, and tactical team officers were trained, that strip searches were to occur "top to bottom," beginning with the inmate's head and moving downward.  Docs. 481-6 at 122:14-16; 481-7 at 136:24-137:10; 481-16 at 304:7-13; 481-17 at 344:4-19; 481-20 at 70:1-8.  "Reverse" strip searches were forbidden.  Docs. 481-6 at 122:4-19; 481-7 at 136:24-139:1; 481-16 at 271:10-14; 481-20 at 70:9-71:4; 481-26 at 76:21-77:22.  When getting dressed after strip searches, inmates were told not to put on underwear because contraband could be hidden therein.  Docs. 481-16 at 267:14-20; 481-17 at 155:11-19, 342:24-343:4.

Inmates were escorted to a waiting area while tactical team officers searched their cells.  Docs. 481-18 at 67:17-68:10; 481-19 at 55:19-56:3; 481-20 at 54:14-19; 481-26 at 44:12-16.  For security purposes, inmates were required to walk to the waiting area in close formation with their heads down and wearing handcuffs. Docs. 481-6 at 126:8-16, 127:3-14; 481-16 at 279:19-280:6; 481-17 at 231:11-232:19, 236:22-237:8, 342:8-13; 481-18 at 67:23-68:10; 481-20 at 56:6-57:11; *see also* Doc. 491-8 (photographs showing inmates being escorted between living spaces and waiting area).  Department training directed that inmates be handcuffed in the back with palms facing out, because that is more secure.  Docs. 481-16 at 302:14-303:2; 481-17 at 246:22-247:21; 481-19 at 56:16-20.  But Department policy instructed employees to honor medical permits that required certain inmates to be

cuffed in front. Docs. 481-6 at 130:17-22; 481-7 at 83:7-16, 143:6-14; 481-16 at 262:15-21; 481-17 at 212:11-13, 214:1-6; 481-20 at 96:3-8. Requiring inmates to walk so that one inmate's genitals touched another's backside would have been against Department policy. Docs. 481-6 at 125:4-12; 481-7 at 143:15-144:11; 481-17 at 235:12-236:18, 238:7-13; 481-26 at 79:15-80:6. So would have been the unnecessary use of force, including pushing an inmate's head against another inmate's back. Docs. 481-7 at 144:12-15; 481-16 at 278:20-279:1; 481-17 at 205:3-19.

In the waiting area, inmates were directed stand or sit with their heads down for security purposes. Docs. 481-18 at 79:7-9, 82:14-19; 481-19 at 228:23-229:11; 481-26 at 45:14-17. But standing inmates were allowed to sit if they asked to do so. Doc. 481-6 at 74:18-20, 128:5-9. The same was true of any request to use the bathroom, so long as the inmate was not on a list to be drug tested and waited his turn. Docs. 481-6 at 129:8-16, 169:1-20; 481-7 at 145:18-146:4; 481-17 at 226:11-9.

For their part, plaintiffs presented evidence of ways in which some Department employees allegedly departed from Department policies and training. For example, 50 of plaintiffs' 82 inmate accounts reported that a "reverse" strip search was conducted,[3] while 61 of the 82 inmates indicated their handcuffs were

---

[3] Thirty-two of plaintiffs' 82 accounts did not include a "reverse" strip search. Docs. 481-35 (47:7-20) (Watts); 481-51 at 10 ¶9 (B. Robinson), 18 ¶9 (Huffman), 22 ¶9 (Bell), 26 ¶9 (Coleman), 42 ¶9 (Linzy), 50 ¶9 (White), 54 ¶9 (Palmer), 62 ¶9 (Drabing), 70 ¶9 (Johnson), 78 ¶9 (Skinner), 82 ¶9 (Burns), 85 ¶¶8-9 (Gil-Ramos), 98 ¶9 (Deloney), 106 ¶9 (Thomas), 110 ¶9 (Kirk), 114 ¶9 (Lockhart), 122 ¶9 (Tomberg), 149 ¶8 (Price), 154 ¶9 (W. Robinson), 165 ¶8 (Whitlock), 184 ¶8 (Moore), 192-94 (Graham); 491-7 at 13 (6:10-18) (Cowart), 60-66 (Bartholomew), 92 (5:1-7)

too tight.[4]  Of the 29 inmate accounts presented by defendants, however, 8 reported

that a "reverse" strip search was conducted,[5] and 4 described tight handcuffs.[6]

Thus, of the 111 inmate accounts presented by plaintiffs and defendants combined,

58 reported a "reverse" strip search and 65 reported tight handcuffs.  Furthermore,

although 77 of the 111 inmates reported being required to walk so close together

that their genitals touched another inmate,[7] only 20 recalled being told to line up

---

(Carrillo), 107-09 (Durall), 138-41 (P. Hawkins), 161-62 (Lay), 166-68 (Love), 176-78 (Milons), 182-83 (Montanez).

[4]  Twenty-one of plaintiffs' 82 accounts did not report tight handcuffs.  Docs. 481-29 at 55-56 (Tolliver); 481-32 (Hamilton); 481-34 (Dunmore); 481-37 (Truly); 481-43 (McDaniel), 481-44 (Miller); 481-45 (Miller); 481-46 (Smith); 481-51 at 6 ¶11 (Smith), 176-79 (Williams), 181 ¶10 (Jackson); 491-7 at 12-15 (Cowart), 43(6:6) (Akins), 91-93 (Carrillo), 121-22 (Gray),125-26 (Grines), 138-40 (Hawkins), 161-62 (Lay), 166 (4:12-13) (Love), 171-72 (Max), 182-83 (Montanez).

[5]  Twenty-one of defendants' 29 accounts did not include a "reverse" strip search.  Doc. 491-7 at 2 (5:3-6) (D'Loney), 7 (5:14-16) (Buchanan), 18-19 (Anderson), 29-30 (Russo), 32-33 (S. Hopkins), 55-57 (Barnes), 72 (6:9-13) (Boose), 77-78 (Borsey), 81-83 (Bosomworth), 87 (6:6-14) (Burnside), 96-99 (Chacon), 102-04 (Colm), 112-13 (Flores), 134 (5:14-18) (Hall), 144-47 (Jones), 156-58 (Kley), 166-68 (Love), 187-88 (Moreno), 206-09 (Williams), 212-13 (Varnado); Doc. 491-1 at 35-36 (23-24, 1-6)(Tenney).

[6]  Twenty-five of defendants' 29 accounts did not report tight handcuffs.  Doc. 491-7 at 1-3 (D'Loney), 6-8 (Buchanan), 18-19 (Anderson), 23-26 (Clay), 29-30 (Russo), 32-33 (Hopkins), 35-39 (Lucas), 55-57 (Barnes), 71-74 (Boose) 77-78 (Borsey), 81-83 (Bosomworth), 87 (7:19-8:1) (Burnside), 102-03 (Colm), 112-13 (Flores), 115-18 (Getty), 144-47 (Jones), 150-53 (Kennedy), 156-58 (Kley), 187-88 (Moreno), 191-93 (Ruiz), 196-98 (Scott), 201-03 (Smith), 206-09 (Williams), 212-13 (Varnado); Doc. 491-1 (Tenney).

[7]  Thirteen of plaintiffs' 82 accounts did not report genital contact.  Docs. 481-39 at 1-18 (Fisher); 481-35 (Watts); 481-32 at 73:13-75:4 (K. Hamilton); 491-7 at 60-66 (Bartholomew), 91-93 (Carrillo), 121 (4:8-10) (Gray), 125-26 (Grines), 129-30 (Guzman), 161-62 (Lay), 166-68 (Love), 171-73 (Max), 177 (5:14-21) (Milions), 182-83 (Montanez).  Twenty-one of defendants' 29 accounts likewise did not report this.

"nuts to butts,"[8] and 34 did not report having been pushed or otherwise physically forced into line.[9]

The 111 inmates also reported waiting for varying times while their cells were searched. For example, of the 21 Lawrence accounts, 4 did not describe the

Doc. 491-7 at 6-8 (Buchanan), 18-20 (Anderson), 29-30 (4:23-5:2) (Russo), 32-33 (Hopkins), 47-51 (Alvinston), 55-57 (Barnes), 71-74 (Boose), 77-78 (Borsey), 81-83 (Bosomworth), 86-88 (Burnside), 96-98 (Cachon), 102-04 (Colm), 112-13 (Flores), 134 (8:20-24) (Hall), 151 (8:18-21) (Kennedy), 157 (6:13-16) (Kley), 187-88 (Moreno), 191-93 (Ruiz), 196-98 (J. Scott), 206-09 (L. Williams), 212-13 (Varnado).

[8] Twenty inmates reported being told to line up "nuts to butts." Docs. 481-33 at 62:1-8 (Vesser); 481-40 at 71 (12-21) (Harding); 481-51 at 138, ¶ 16 (Henderson), 190 ¶18 (Lyons); 491-7 at 2 (6:24) (D'Loney), 23 (4:24) (Clay), 43 (6:12-13) (Akins), 116 (5:-17) (Getty) 202 (7:17) (Smith); 481-30 at 56:1 (Smith); 481-31 at 74:18 (Ross); 481-32 at 65:16 (Hamilton); 481-36 at 88:24 (Clark); 481-42 at 66:13 (Knox); 481-43 at 35:13 (McDaniel); 481-41 at 51:3 (Johnson); 481-45 at 67:18 (H. Miller); 481-49 at 48:16 (J. Miller); 481-37 at 64:17-22 (Truly); Doc. 491-1 at 27-28(20-24,1-2) (Tenney).

[9] Thirty-four of the 111 inmates did not report being touched by Department employees in any manner. Docs. 481-33 (Verser); 481-35 (Watts); 481-43 (McDaniel); 481-51 at 2-4 (A. Smith), 69-72 (Johnson), 125-28 (R. Robinson), 129-32 (Martinez), 133-36 (Daubman), 153-56 (W. Robinson), 168-71 (Zoberis); 491-7 at 2 (7:10) (D'Loney), 18-20 (Anderson), 29-30 (Russo), 32-33 (S. Hopkins), 37 (9:24)(Lucas), 49 (10:18-19) (Alvinzston), 77-78 (Borsey), 82 (7:8) (Bosomworth), 88 (9:4-8) (Burnside), 97 (6:9) (Cachon), 102-03 (Colm), 107-09 (Durall), 115-17 (Getty), 121 (4:24)(Gray), 125-26 (Grines), 133-35 (Hall), 138-40 (P. Hawkins), 144-47 (Jones), 162 (5:5) (Lay), 166-68 (Love), 171-73 (Max), 192 (7:6) (Ruiz), 187-88 (Moreno), 196-98 (Scott).

wait time,[10] 12 described a wait of more than an hour,[11] 3 reported 2-3 hours,[12] and

2 recalled a 5-hour wait.[13]  Of the 34 Big Muddy inmates, 9 made no mention of

wait time,[14] 19 reported less than 2 hours,[15] and 6 estimated 2-3 hours.[16]  Inmates

also reported differing conditions in the waiting areas.  At Lawrence and Big

Muddy, inmates reported sitting at tables with heads down, *e.g.,* Doc. 491-7 at 82

(6:7-11), 177(6:15-18), whereas at Illinois River and Menard, inmates reported

standing with their foreheads touching the wall, *e.g., id.* at 33(6:8-12), 122(5:12).

Plaintiffs moved for class certification on the Eighth Amendment, conspiracy,

and failure to intervene claims only.  Doc. 481 at 1 & n.1.  They proposed a class of

approximately 9,871 inmates across the four facilities with Ross (Illinois River),

---

[10]  Docs. 481-40 at 166:9-11 (Harding); 481-44 (Miller); 481-47 (Sultan); 481-5 at 2-4 (Smith).

[11]  Docs. 481-51 at 15 ¶27 (Washington), 51 ¶28 (White), 63 ¶27 (Gherna), 83 ¶28 (Burns), 87 ¶27 (Gil-Ramos), 95 ¶28 (Wachter), 131 ¶26 (Martinez), 167 ¶23 (Whitlock), 174 ¶27 (West), 186 ¶27 (Moore), 190 ¶27 (Lyons), 193 (Graham).

[12]  Docs. 481-33 at 133:18-21 (Verser); 481-37 at 78:21 (Truly); 481-38 at 35:14 (Cortes).

[13]  Docs. 481-46 at 61:23 (Smith); 491-7 at 177 (8:16-18) (Milons).

[14]  Docs. 481-35 (Watts); 481-41 (Johnson); 481-45 (Miller); 491-7 at 47-51 (Alvinzston), 77-78 (Borsey), 91-93 (Carrillo), 112-13 (Flores), 125-26 (Grines), 156-58 (Kley).

[15]  Docs. 481-39 at 48:15-16 (Fisher); 481-51 at 7 ¶27 (Smith), 35 ¶29 (Ramsey), 59 ¶27 (Weems), 75 ¶27 (Getty), 147 ¶27 (Basquine), 170 ¶24 (Zoberis), 178 ¶25 (Williams); 491-7 at 43 (7:18-19)(Akins), 82( 6:13-14) (Bosomworth), 103 (6:5-6) (Colm), 108 (7:14-15) (Durall), 134 (8:10-11) (Hall); 146 (11:5-7) (Jones), 152 (9:15) (Kennedy); 192 (7:16-17) (Ruiz); 197 (7:9) (Scott), 203 (10:7) (Smith); 212 (4:23) (Varnado).

[16]  Docs. 481-32 at 81:9 (Hamilton); 491-7 at 87 (8:7) (Burnside), 97 (6:14) (Chacon), 12 (17-18) (Getty), 168 (9:13) (Love), 208 (10:2-3) (Williams).

Tolliver and Smith (Menard), Hamilton (Big Muddy), and Verser (Lawrence) as representatives. *Id.* at 22, 24, 30. Relevant here, plaintiffs offered four questions that purportedly were common and predominate over individualized questions, namely whether: (1) the "uniform shakedowns at the four prisons were executed . . . in the manner Defendants contend, or instead in the manner Plaintiffs contend"; (2) the shakedowns violated the Eighth Amendment; (3) the supervisory defendants "knew, facilitated, approved, condoned, and/or turned a blind eye to the uniform shakedown practice"; and (4) the supervisory defendants "reached an agreement among themselves and/or others to perform the shakedowns in the uniform unconstitutional manner alleged by the class." *Id.* at 27-28. Plaintiffs also asserted that their proposed class representatives were typical of the class because "[t]heir claims ar[o]se from the same course of conduct that g[ave] rise to the claims of other class members and they [we]re based on the same legal theory." *Id.* at 30. They added that common issues predominated over individualized ones because the common questions would be "answered with class-wide evidence that applies to all class members equally[.]" *Id.* at 34.

Defendants responded that plaintiffs failed to establish Rule 23(a)(2)'s commonality requirement because they did not present sufficient evidence to support their claim that the 2014 shakedowns occurred pursuant to a policy as they alleged existed. Doc. 491 at 13-18. Specifically, because the inmates' testimony about the shakedowns was inconsistent and varied, plaintiffs could not show that defendants' conduct was common to all class members or that it was performed

pursuant to the policy that plaintiffs claimed existed. *Id.* at 17. In addition, defendants observed, plaintiffs' class claims failed because at least some of defendants' conduct served legitimate penological purposes and thus would not violate the Eighth Amendment. *Id.* at 17-28. And some of plaintiffs' testimony about how the cell shakedowns were conducted, if accepted as true, was contrary to defendants' stated policies. *Id.* at 20-22, 24-26. As defendants further explained, given the inconsistencies and discrepancies in plaintiffs' testimony, the named plaintiffs' claims were not typical of the claims of the proposed class. *Id.* at 30-35. Finally, defendants noted that plaintiffs did not show that common questions predominated over individual ones. *Id.* at 35.

**The district court's class certification order**

The district court granted plaintiffs' motion for class certification. Doc. 519 at 1; A1. The court first concluded that the proposed class of 9,871 inmates was ascertainable and sufficiently numerous. Doc. 519 at 4-6; A4-6. Next, it determined that plaintiffs had satisfied Rule 23's commonality requirement because they "allege Defendants uniformly engaged in conduct and implemented the same or similar procedures at each of the four institutions" and because their "claims arise under the same constitutional requirements and require resolution of key common factual and legal questions." Doc. 519 at 7; A7. In reaching this conclusion, the court rejected defendants' arguments about the sufficiency of plaintiffs' evidence, explaining that those "are appropriately raised on summary judgment; they are not relevant or determinative for class certification purposes." Doc. 519 at 8; A 8.

The court also determined that plaintiffs had satisfied the typicality requirement because the representative plaintiffs "[e]ach allege[ ] that during uniformly executed shakedowns, they and the putative class members, were subjected to humiliating and unsanitary strip searches and line movements and that they were subjected to uncomfortable and painful handcuffing and extended hours of uncomfortable standing or sitting." Doc. 519 at 9; A9. Relatedly, it concluded that predominance and superiority were satisfied because, although the "class members' particular experiences may vary to some degree, any such variation would primarily impact the type and amount of recoverable damages[.]" Doc. 519 at 11; A 11; *see also* Doc. 519 at 12; A12.

Accordingly, the district court certified a class comprising all inmates at Menard from April 4-16, 2014; Illinois River from April 21-29, 2014; Big Muddy from May 12-19, 2014; and Lawrence from July 7-11, 2014. Doc. 519 at 12; A12. On April 9, 2020, defendants filed a petition for permission to appeal from the district court's order granting class certification, 7th Cir. App. No. 20-8011, Doc. No. 1, which this court granted, 7th Cir. App. No. 20-8011, Doc. No. 14, docketing this permissive appeal as No. 20-1992.

# SUMMARY OF ARGUMENT

Plaintiffs sought class certification on the theory that 22 supervisory defendants organized and oversaw shakedowns at four prisons pursuant to an illegal policy that, if it had been followed, would have been inconsistent with the Department's written policies and training. Defendants agreed that they conducted the shakedowns but maintained they were not done as plaintiffs alleged. Defendants thus denied plaintiffs' allegations that they agreed to deviate from the Department's written policies and training by directing the non-supervisory defendants to engage in unlawful conduct, and also that plaintiffs offered "significant proof," as Rule 23 requires, *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352-53 (2011), that the shakedowns occurred as plaintiffs claimed.

When ruling on a class certification motion, district courts are to conduct a rigorous analysis of the evidence presented, which includes resolving material factual disputes. This analysis is designed to ensure that certification is not granted lightly, because a ruling either way can "cause a considerable tilt in the playing fields of litigation[.]" *Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). But the district court here did not undertake the requisite analysis. Instead, it accepted plaintiffs' version of events as true—at times even relying solely on plaintiffs' unsworn allegations—without assessing the evidence that defendants marshaled in support of their objection. Had the district court conducted the required rigorous analysis, it would have denied class certification. Indeed, when viewed under the appropriate standard, the

evidence presented does not satisfy the commonality, typicality, or predominance requirements set forth in Rule 23.

Specifically, plaintiffs' inconsistent evidence, which represented less than 1% of the total number of class members, did not constitute significant proof that defendants conducted cell shakedowns pursuant to an unlawful common policy. On the contrary, the anecdotal accounts provided by plaintiffs reported a wide variety of different experiences during the shakedowns. And without a common policy, plaintiffs could not establish that the named plaintiffs' claims were typical of the class members'. This is especially so given that the proposed representatives' testimony differed from other class members' accounts in significant ways. Finally, plaintiffs did not establish that common questions predominated over individual ones, and thus did not satisfy the demanding predominance standard. Because plaintiffs failed to show that the proposed class members shared a uniform experience, any class action would necessarily devolve into a series of individualized trials on whether each inmate was subjected to unconstitutional conditions and, if so, by which supervisory defendant.

In short, without sufficient proof of an unlawful policy, plaintiffs are left with inconsistent evidence of shakedowns performed by hundreds of individual defendants. Under these circumstances, the district court abused its discretion by granting plaintiffs' class certification motion. This court should reverse.

# ARGUMENT

## I.    The abuse of discretion standard of review applies here.

This court reviews a district court's decision to grant class certification for an abuse of discretion. *Chi. Teachers Union*, 797 F.3d at 433. "A district court abuses its discretion when it commits an error of law or makes a clearly erroneous finding of fact." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 892 (7th Cir. 2012). While this court's review of the decision to grant class certification is deferential, it "can and must also be exacting." *Chi. Teachers Union*, 797 F.3d at 433. Indeed, even under the deferential abuse of discretion standard, this court must "still scrutinize the district court's determination to ensure that it invoked the correct legal standards and that its findings of fact are not clearly erroneous." *Chavez v. Ill. State Police*, 251 F.3d 612, 628-29 (7th Cir. 2011) (internal quotations omitted).

## II.   The district court abused its discretion when concluding that plaintiffs satisfied the commonality, typicality, and predominance requirements for class certification.

The district court abused its discretion by granting plaintiffs' motion for class certification. To proceed as a class action, a plaintiff must establish each of the following requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In addition, "a class action must meet the requirements of one of the four categories in Rule 23(b)." *Chi. Teachers Union*, 797 F.3d at 433. In this

case, plaintiffs sought certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and the court must find that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Because a class action "is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotations omitted), a party seeking class certification "must affirmatively demonstrate his compliance with [Rule 23]," *Wal-Mart*, 564 U.S. at 351.  Thus, Rule 23 requires more than a "mere pleading standard," *id.* at 350, and a court cannot "simply assume the truth of the matters as asserted by the plaintiff," *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (cleaned up).  Rather, it is the plaintiff's burden to present evidence establishing that the Rule 23 requirements are met.  *Id.*  Failure to do so "precludes class certification."  *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008).

Additionally, the court must conduct a "rigorous analysis" to determine whether "the prerequisites of Rule 23(a) have been satisfied."  *Wal-Mart*, 564 U.S. at 350-51 (internal quotations omitted).  Where material factual disputes exist, the court must "resolve the disputes before deciding whether to certify the class."  *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).  And where a district court, when ruling on a motion for class certification, omits factual and legal analysis, it abuses its discretion.  *See Beaton v. SpeedyPC Software*, 907 F.3d 1018,

1025 (7th Cir. 2018).  The district court here did not conduct a "rigorous analysis" to determine whether Rule 23's requirements were satisfied, *Wal-Mart*, 564 U.S. at 350-51 (internal quotations omitted), as it was required to do.  As explained below, the district court did not thoroughly analyze the evidence presented at the class certification stage, nor did it engage with defendants' arguments that the evidence fell short of allowing plaintiffs to meet their burden to show that class certification was warranted.  These errors affected the ultimate outcome, as plaintiffs did not establish, by a preponderance of the evidence, *see Priddy*, 870 F.3d at 660, that they met all of Rule 23(a)'s requirements.  Specifically, plaintiffs did not show that there were questions of law and fact common to the class, that the representative plaintiffs' claims were typical of the class members' claims, or that the common questions or law or fact predominate over individual questions.

### A.    Plaintiffs did not carry their burden to establish Rule 23(a)(2)'s commonality requirement because they failed to marshal significant proof that defendants' 2014 shakedown policy existed as they alleged that it did.

To begin, the district court abused its discretion in granting class certification because plaintiffs failed to carry their burden of showing that there were "questions of law or fact common to the class," as required by Rule 23(a)(2).  "Although a court need only find a single common question of law or fact, the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough."  *Chi. Teachers Union*, 797 F.3d at 434 (internal quotations omitted).  Indeed, "any competently crafted class complaint literally raises common questions," but Rule 23(a)(2) requires more.  *Wal-Mart*, 564 U.S. at 349 (internal

quotations omitted). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (internal quotations omitted) (emphasis in original).

Plaintiffs claimed that defendants conducted the shakedowns pursuant to an unconstitutional policy. Doc. 197 at 37-40; Doc. 481 at 27-29. *Wal-Mart* allows plaintiffs to establish commonality through such a theory, provided that they present "***significant proof***" of that policy at the class certification stage. 564 U.S. at 352-53. A prison's policy may establish commonality where the policy is undisputed and the common question turns on whether it violates inmates' rights. *Arreola*, 546 F.3d at 798. But the policy here was disputed: defendants testified that had the shakedowns occurred as plaintiffs alleged, several aspects would have violated Department policies and training. *Supra* pp. 8-9. Thus, it was plaintiffs' burden to present "significant proof," *Wal-Mart*, 564 U.S. at 353, that the alleged shakedown policy existed notwithstanding defendants' denials. And plaintiffs could have carried this burden through statistical evidence, expert reports, or anecdotal evidence. *Id.* at 353-58.

Plaintiffs chose to proceed with anecdotal evidence. That evidence, however, did not support a finding of commonality for two reasons. First, the number of anecdotal accounts (82 of the 9,871 proposed class members) that plaintiffs presented at class certification did not constitute significant proof that defendants' cell shakedown policy existed as plaintiffs claimed it did. Second, even if the total

quantum of evidence that plaintiffs presented was sufficient, it was not significant proof that the policy existed as plaintiffs claimed because the anecdotes were varied and inconsistent.

First, the total amount of evidence plaintiffs presented did not rise to the level of "significant proof" of a policy as they claimed existed. Where plaintiffs proceed with anecdotal evidence of a policy, courts should compare the size of the proposed class to the number of members about whom they presented evidence. *See Wal-Mart*, 564 U.S. at 358. For example, in *Wal-Mart*, the Supreme Court held that plaintiffs did not present significant proof of an unlawful policy, in part because they submitted affidavits from 120 class members, or one for every 12,500. *Id.* In contrast, in *Teamsters v. United States,* 431 U.S. 324 (1977), plaintiffs submitted evidence of 40 instances of racial discrimination for a 334-person class. *Id.* at 337, 357. That evidence, which represented "roughly one account for every eight members of the class," was sufficient to establish commonality. *Wal-Mart,* 564 U.S. at 358.

Here, plaintiffs presented anecdotal evidence from 82 of the 9,871 proposed class members. *See supra* pp. 12-14. That was approximately 1 of every 120 class members, or less than 1%. And for Illinois River, the ratio was worse: plaintiffs submitted evidence from only 10 of the 1,929 inmates, Docs. 481 at 27; 481-29-47, 49-63, or 1 of every 192. Although plaintiffs' evidence was greater than the 1-to-12,500 ratio in *Wal-Mart*, it fell far below the 1-to-8 ratio in *Teamsters*. And this court has held that more substantial evidence than plaintiffs' was not enough for

commonality. In *Jamie S. v. Milwaukee Public School*, 668 F.3d 481 (7th Cir. 2012), plaintiffs sought to certify a class of students whom they alleged were injured by defendant's purported policy of violating the Individuals with Disabilities Education Act. *Id.* at 485. This court held that a review by plaintiffs' expert of files concerning 200 of the approximately 16,000 class members, *id.* at 488, was insufficient to meet *Wal-Mart*'s "significant proof" requirement for commonality, *id.* at 498 (internal quotations omitted). The expert "did not explain how review of 200 student files could yield a conclusion that [the defendant] was in systemic violation of the IDEA," *id.* at 488, and "proof of an illegal policy" was otherwise "entirely absent," *id.* at 498 (internal quotations omitted); *see also Phillips v. Sheriff of Cook County*, 828 F.3d 541, 554-55, 558 (7th Cir. 2018) (though proof of a "systemic practice [ ] could tie all [plaintiffs'] claims together," testimony by eight detainees that they had suffered a delay in receiving dental treatment was not sufficient to show a "gross and systemic deficiency that applies to the entire class").

Second, even if evidence of about less than 1% of the proposed class could have sufficed, plaintiffs' evidence was not "significant proof" of an unlawful policy because it was varied and inconsistent. Plaintiffs alleged that the shakedown policy included "reverse" strip searches, derogatory and offensive language, "unnecessarily painful" handcuffing, ordering inmates to walk so closely together that they made contact with others' genitals, and the use of "forced stress positions in the holding area." Doc. 481 at 11-12, 27. But plaintiffs offered no evidence that the supervisory defendants instructed the tactical team officers to conduct the shakedowns this

way, *see supra* pp. 9-12, nor did they establish that a meaningful number of the 111 inmates about whom specific evidence was presented experienced all, or even many, of those conditions.

For example, 58 of 111 inmates (52%) reported that they were subjected to a "reverse" strip search. *See supra* p. 9. That was barely more than one half. Sixty-five of 111 inmates (59%) reported that their handcuffs were too tight. *Id.* at pp. 9-10. Seventy-seven of 111 inmates (69%) said that they had to walk so closely together that their genitals touched another's backside. *Id.* at 10. But only 18% reported that they were told to walk "nuts to butts," and approximately one-third did not report that they were pushed or otherwise physically forced into line. *Id.* at 10-11. And inmates' accounts varied about how long they had to wait, and whether they were required to stand or sit. *See supra* pp. 11-12. These discrepancies should have doomed a commonality finding because resolution of these questions would not provide answers common to all class members. *See Wal-Mart*, 564 U.S. at 350 ("[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers"). This is particularly true because the 111 inmate accounts represented only 1% of the proposed class. In other words, the approximately 50% of inmates who reported being "reverse" strip searched or cuffed too tight constituted one-half of 1% of the proposed class.

Much more is required to satisfy commonality. For example, in *Bell v. PNC Bank, National Association*, 800 F.3d 360 (7th Cir. 2015), the plaintiff claimed that PNC had an unofficial policy of failing pay its employees for overtime work and

offered anecdotal evidence from 24 of the 26 branches at issue, 20 of which supported her claim. *Id.* at 365-71. In fact, for some of those branches, the branch manager admitted the existence of the challenged policy. *Id.* at 366. This evidence, this court concluded, was sufficient to show that "the denial of overtime pay came from a broader company policy and not from the discretionary decisions of individual managers." *Id.* at 375. Here, by contrast, *see supra* pp. 22-23, defendants uniformly disputed the existence of plaintiffs' alleged policy, and plaintiffs' anecdotal evidence about that purported policy was varied and inconsistent. Given the evidence presented, the district court abused its discretion in finding commonality.

Had the district court conducted the requisite "rigorous analysis," *Wal-Mart*, 564 U.S. at 350-51, it would have determined that plaintiffs failed to satisfy Rule 23's commonality requirement. In discussing whether plaintiffs satisfied commonality, the district court did not describe, much less rely on, the evidence presented at the class certification stage; instead, it stated that "[p]laintiffs *allege* [d]efendants uniformly engaged in conduct and implemented the same or similar procedures at each of the four institutions where the . . . shakedowns took place." Doc. 519 at 7; A7 (emphasis added). But courts addressing requests for class certification are prohibited from "simply assum[ing] the truth of the matters as asserted by the plaintiff." *Bell*, 800 F.3d at 377. Rather, "[i]f there are material factual disputes that *bear on the requirements for class certification*, the court must receive evidence if only by affidavit and resolve the disputes before deciding

whether to certify the class." *Id.* (emphasis in original; internal quotations omitted); *accord Szabo*, 249 F.3d at 676.

As for defendants' arguments and evidence, the district court dismissed them in a few sentences, reasoning that "[f]or the most part, [d]efendants' arguments address the merits of [p]laintiffs' claims rather than the sufficiency of the bases for class certification." Doc. 519 at 7; A7. This was incorrect. As the Supreme Court has recognized, the commonality analysis frequently "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351. The district court also cited *Kohen v. Pacific Investment Management Company LLC*, 571 F.3d 672 (7th Cir. 2009), for the proposition that "a class will often include persons who have not been injured by the defendant's conduct." Doc. 519 at 8. But defendants never argued that class certification was improper because some members of the proposed class may not have been injured. *See generally* Doc. 491. Instead, they argued that the inmates' varied and inconsistent accounts meant that "no uniform policy . . . can be gleaned from [their] testimony." *Id.* at 17. Again, where, as here, there are material factual disputes bearing on the requirements for class certification—namely, whether the evidence plaintiffs offered supported an inference that defendants operated under a policy as plaintiffs claimed existed— then the district court must resolve those disputes before deciding whether to certify the class. *Bell*, 800 F.3d at 377; *Szabo*, 249 F.3d at 676. The district court abused its discretion by failing to do that here. *See Beaton*, 907 F.3d at 1025.

26

**B.    Plaintiffs failed to meet Rule 23(a)(3)'s typicality requirement because they did not show that the representative plaintiffs' claims were typical of the proposed class members' claims.**

The district court further abused its discretion in determining that plaintiffs established that their class representatives' claims were typical of the proposed class members' claims. The typicality requirement "is closely related to the . . . question of commonality." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). A representative's claim "is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (internal quotations omitted).

The district court determined that the named plaintiffs' claims were typical of the class because "[e]ach *alleges* that during uniformly executed shakedowns, they and putative class members, were subjected to humiliating and unsanitary strip searches and line movements and that they were subjected to uncomfortable and painful handcuffing and extended hours of uncomfortable standing or sitting[.]" Doc. 519 at 9; A9 (emphasis added). But again, plaintiffs' allegations should have been deemed insufficient at the class certification stage. *Wal-Mart*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.").

And as explained, *see supra* pp. 22-23, plaintiffs' evidence represented less than 1% of the proposed class, and was inconsistent both within the group of inmates identified by plaintiffs and as compared to other inmates identified by defendants. Without a common policy requiring that the shakedowns occur as alleged, *see supra* pp. 20-26, or even a common experience among the class

members, plaintiffs could not show that the representative plaintiffs' claims were typical of the proposed class members. For example, an inmate who experienced some of the alleged actions, such as derogatory language or too-tight handcuffs, would not have a claim that was sufficiently similar to the claim of a class representative who reported different actions, such as being "reverse" strip searched, required to walk with his genitals touching another inmate's backside, and being hit on the back of his head and pushed to his knees while waiting in line, as proposed class representative Ross described. Doc. 481-31 at 39:8-12, 70:19-20, 89:13-17, 90:16-24. No other inmate at Illinois River (or any other named plaintiff) reported anything similar.

To be sure, there may be "factual distinctions between the claims of the named plaintiffs and those of other class members." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 597 (7th Cir. 1993) (internal quotations omitted). But without significant proof of an unlawful policy, plaintiffs are left with inconsistent evidence of shakedowns performed by hundreds of individual defendants, and so plaintiffs failed to show that the experiences of the class representatives were typical of the class members. *See Kress*, 694 F.3d at 893 (affirming district court's decision to deny class certification because plaintiffs did not establish typicality where "claims of inadequate medical care by their nature require individual determinations").

## C. Plaintiffs also failed to satisfy Rule 23(b)(3)'s demanding predominance requirement.

Finally, even if this court determines that plaintiffs satisfied Rule 23(a)'s commonality and typicality requirements, it should nonetheless reverse the district

court's order because plaintiffs did not meet Rule 23(b)(3)'s predominance requirement. The district court's incorrect determination to the contrary rested on the conclusory statement that "common questions inherent in Plaintiffs' Eighth Amendment claims predominate over individualized questions." Doc. 519 at 12; A12.

Rule 23(b)(3) requires that a district court find that "questions of law or fact common to class members predominate over any questions affecting only individual members," and, relatedly, that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Like commonality and typicality, the predominance requirement is subject to a rigorous analysis, *see Comcast Corp.*, 569 U.S. at 33-34, but one that "is even more demanding than Rule 23(a)," *id.* at 34; *see also Amchem Prod., Inc., v. Windsor*, 521 U.S. 591, 624 (1997) (describing predominance as "far more demanding" than commonality). The requirement is satisfied "when common questions represent a significant aspect of [a] case," *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (internal citations and quotations omitted), and the "proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prod.*, 521 U.S. at 623. In other words, Rule 23(b)(3) asks whether "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal quotations and citations omitted).

Analyzing whether plaintiffs met Rule 23(b)(3)'s predominance requirement "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *see also Simer v. Rios*, 661 F.2d 655, 672 (7th Cir. 1981) ("Our first focus must be on the substantive elements of plaintiffs' cause of action and inquire into the proof necessary for the various elements."). An Eighth Amendment deliberate indifference claim requires a showing that defendants (1) objectively "exceeded contemporary bounds of decency of a mature, civilized society," and (2) acted "wantonly and with a sufficiently culpable state of mind." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). Whether an action or condition amounts to deliberate indifference is a fact-specific inquiry. *Gillis v. Litscher*, 468 F.3d 488, 493-94 (7th Cir. 2006); *compare Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) (force that caused bruising and swelling, among other things, stated a claim under Eighth Amendment) *with DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000) ("simple act of shoving" was *de minimis* and did not violate the Eighth Amendment) (abrogated on other grounds by *Savory v. Cannon*, 947 F.3d 409, 422-23 (7th Cir. 2020)).[17]

Given the variation in and inconsistency among the experiences reported by the inmates, *see supra* pp. 9-12, individual questions would predominate over common ones when resolving plaintiffs' Eighth Amendment claim, requiring the

---

[17] At least one component of the alleged policy—entering the inmates' living spaces loudly—does not violate the Eighth Amendment in most circumstances. *See Lunsford*, 17 F.3d 1574, 1580 (7th Cir. 1994) (loud noises that annoy, but do not injure, inmates do not amount to deliberate indifference).

district court to conduct thousands of individual trials to determine liability. Such a result would negate any practical benefit otherwise derived from proceeding on a classwide basis. *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("If resolving a common issue will not greatly simplify the litigation to judgment or settlement of claims of hundreds or thousands of claimants, the complications, the unwieldiness, the delay, and the danger that class treatment would expose the defendant or defendants to settlement-forcing risk are not costs worth incurring.").

Among other individualized inquiries, the district court would need to examine which components of the alleged policy each inmate was subjected to. For example, an inmate subjected to a "reverse" strip would likely have a more viable Eighth Amendment claim than an inmate searched "top to bottom" as Department policy requires. *See Fillmore v. Page*, 358 F.3d 496, 505 (7th Cir. 2004) ("[s]trip searches are not *per se* unconstitutional," but inmates may recover damages if they are conducted in a "harassing manner intended to humiliate and inflict psychological pain"). Similarly, whether an inmate may succeed on an Eighth Amendment claim asserting too-tight handcuffs will depend on factors including whether the defendant knew that the handcuffs were too tight given the circumstances, *see Ajala v. Tom*, 658 F. App'x 805, 806-07 (7th Cir. 2016), and whether they caused the inmate's injury, *see Polzin v. Ericksen*, 607 F. App'x 572, 573 (7th Cir. 2015); *see also Tibbs v. City of Chi.*, 469 F.3d 661, 665-66 (7th Cir. 2016) (claim alleging too-tight handcuffs under Fourth Amendment requires consideration of whether use of handcuffs was reasonable and degree of injury, if

any, suffered by plaintiff). Relatedly, if an inmate claimed that he was subjected to excessive force while walking to the waiting area, the district court would have to decide whether the force used was more than *de minimis*, and, if so, whether it was "applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

This prevalence of issues requiring individualized determinations should have precluded a predominance finding. *See Harper v. Sheriff of Cook County*, 581 F.3d 511, 514-15 (7th Cir. 2009) (predominance lacking where the constitutionality of holding detainees after bond was posted depended on the reasonableness of the delay, which was an "individual issue that will depend on how long each detainee was held after bond was posted and what justifications there might be for the delay"); *see also Blyden v. Mancusi*, 186 F.3d 252, 271 (2d Cir. 1999) (questioning the benefit of certifying class of prisoners where each was subject to different conduct and "a trier must determine what happened and . . . its constitutional significance."). The district court rejected this, stating that "these questions go to the merits of the *common* constitutional claims." Doc. 519 at 12; A12 (emphasis in original). But Rule 23(b)(3)'s predominance requirement "requires the court to engage with the merits of the case[.]" *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020); *see also Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (predominance must "be satisfied by proof presented at the class certification stage rather than deferred to later stages in the litigation") (internal

quotations omitted). The district court's refusal to do so was an abuse of discretion.[18]

Furthermore, plaintiffs moved to certify this class against 22 defendants with supervisory roles. Doc. 481 at 4-5. Because liability under section 1983 requires personal involvement by the defendant, supervisory liability will not be found unless the supervisor, "with knowledge of the subordinate's conduct, approves the conduct and the basis for it." *Chavez*, 251 F.3d at 651. Supervisory claims are thus more difficult to resolve on a classwide basis. *See Blyden*, 186 F.3d at 271 (explaining difficulties in maintaining class action under supervisory liability theory: "[b]ecause Section 1983 liability requires personal involvement, the supervisory liability of several defendants must be determined, another issue with varying components as to each defendant"). This is especially true where, as here, the evidence shows that at worst the non-supervisory defendants departed from the policy set by supervisors, *supra* pp. 8-12, and where those departures impacted inmates on an individualized basis, *see id.*

---

[18] Because plaintiffs cannot show that common questions predominate over individualized ones for purposes of their Eighth Amendment claim, they cannot show predominance for their conspiracy and failure-to-intervene claims, which depend on the existence of an underlying Eighth Amendment violation. *See Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (for inmate to succeed on conspiracy claim, he must establish underlying constitutional violation); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure-to-intervene claim requires plaintiff to establish that defendant "(1) knew that a constitutional violation was committed; and (2) had a realistic opportunity to prevent it.").

Nevertheless, the district court improperly reasoned that "while the class members' particular experiences may vary to some degree, any such variation would primarily impact the type and amount of recoverable damages[.]" Doc. 519 at 11; A11. Although correctly noting that the class members' experiences differed, the court was wrong to conclude that these differences would only impact the damages calculation, as explained. And, even if true, that would still counsel against certifying this class. Although "the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification," *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015), courts still must determine whether there is a "classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact," *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 929 (7th Cir. 2016).

Here, the district court did not identify a classwide method for proving damages, nor could it, given that plaintiffs' own evidence established that the members of the proposed class reported meaningfully different experiences during the shakedowns. *See supra* pp. 10-12. This means that if defendants were found liable to the class, there would need to be 9,871 separate trials on damages, which should have precluded class certification. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013) (class certification not appropriate where it would require 2,341 separate evidentiary hearings, and where it was not possible to compute damages "effortlessly [and] mechanically"); *Cf. Butler*, 727 F.3d at 800

(class certification appropriate where all plaintiffs attributed damages to one of two problems with washing machines, either that mold developed in washing machines or that there was a defect in the control unit).

For similar reasons, the district court abused its discretion when it found that a class action was the superior method for resolving plaintiffs' claims. *See* Doc. 491 at 12. Courts consider overlapping factors when deciding whether predominance and superiority are established. *See Suchaneck v. Sturm Foods, Inc.*, 764 F.3d 750, 759 (7th Cir. 2014). As explained, because the inmates provided varying and inconsistent testimony about their experiences during the shakedowns, and because defendants denied that the shakedown policy plaintiffs claimed existed, thousands of individual trials will be necessary to determine whether the shakedown as experienced by any particular inmate rose to the level of a constitutional violation and, if so, the relief warranted. Under these circumstances, a class action is not the superior method for resolving plaintiffs' claims. *See Andrews v. Chevy Chase Bank,* 545 F.3d 570, 577 (7th Cir. 2008) ("If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims"); *see also Harper*, 581 at 516 (plaintiff's "desire to prove the existence and illegality of [an alleged illegal practice] can be satisfied in an individual suit without the management issues of a class action.").

## CONCLUSION

Defendants-Appellants request that this court reverse the district court's order granting plaintiffs' motion for class certification.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**SARAH A. HUNGER**
Deputy Solicitor General

**KATELIN B. BUELL**
Assistant Attorney General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendants-Appellants

/s/ Kaitlyn N. Chenevert
**KAITLYN N. CHENEVERT**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2127
kchenevert@atg.state.il.us

October 9, 2020

**CERTIFICATE OF COMPLIANCE WITH LENGTH LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

I hereby certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 2019, in 12-point Century Schoolbook font, and complies with Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32(c) in that the brief contains 9,038 words.

/s/ Kaitlyn N. Chenevert
KAITLYN N. CHENEVERT
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2127
kchenevert@atg.state.il.us

**CERTIFICATE OF COMPLIANCE WITH 7TH CIR. R. 30**

In accordance with 7th Cir. R. 30(d), I certify that all materials required by 7th Cir. R. 30(a) and (b) are included in the short appendix to the Brief and Short Appendix of Defendants-Appellants.

/s/ Kaitlyn N. Chenevert
KAITLYN N. CHENEVERT
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2127
kchenevert@atg.state.il.us

# SHORT APPENDIX

## TABLE OF CONTENTS TO THE SHORT APPENDIX

*Page(s)*

Memorandum and Order on Plaintiffs' Motion for Class Certification
March 26, 2020 (Dist. Ct. Doc. 519) .................................................. A 1–A 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **DEMETRIUS ROSS,** *on behalf of himself and all others similarly situated,* **et al.,** | ) ) ) |
| **Plaintiffs,** | ) ) |
| **vs.** | ) **Case No. 15-CV-309-SMY-MAB** ) ) |
| **GREG GOSSETT, et al,** | ) ) |
| **Defendants.** | ) ) |

## <u>MEMORANDUM AND ORDER</u>

**YANDLE, District Judge:**

Plaintiffs Demetrius Ross, Kevin L. Hamilton, Harley Thomas Miller, Marshall McDaniel, Charles Sultan, Sergio Cortes, Zachary Watts, Acacia Brooks (as Special Representative of Brandon Brooks), James E. Dunmore, Glenn Verser, Jammel L. Johnson, Jonathan Tolliver, Ronald Smith, Edward Tenney, Samuel C. Harding, Jeffrey Miller, Clark Truly, Sam Fisher, Ramon Clark, Ted Knox, and Vincent E. Smith, inmates of the Illinois Department of Corrections ("IDOC") who were incarcerated at Illinois River, Big Muddy River, Lawrence and Menard correctional centers during the period April 2014 through July 2014, bring this action individually and on behalf others similarly situated, for violations of their constitutional and statutory rights as alleged in the Second Amended Complaint.

Now pending before the Court is Plaintiffs' Motion for Class Certification (Doc. 481). Defendants filed a Response opposing the Motion (Doc. 491) to which Plaintiffs replied (Doc. 503). For the following reasons, Plaintiffs' Motion is **GRANTED**.

## <u>BACKGROUND</u>

In 2014, IDOC's Chief of Operations, Joseph Yurkovich and Deputy Chief of Operations,

A1

Michael Atchison decided to conduct prison-wide shakedowns in an effort to remove contraband items (Doc. 481-16, pp. 93-94; Doc. 481-67). These shakedowns involved correctional officers from multiple prisons who formed tactical teams supervised by senior IDOC officials, including former Director Salvadore Godinez, other centralized administrators, and head administrators at each of the prisons where the shakedowns occurred (Doc. 481-6, pp 33, 46, 107; Doc. 481-16, p. 100). Yurkovich and Atchison discussed their plan with various personnel, including David White, the Statewide Tactical Commander and Timothy McAllister, the Southern Regional Tactical Commander (Doc. 481-6, p. 47-49; Pl. Doc. 481-68 and 69; Doc. 481-17, pp. 114-115; Doc. 481-71). McAllister and White created "operations orders" which broadly outlined the shakedown schedule and staffing needs (Doc. 481-64, p. 2). McAllister discussed the actual operation of the shakedowns with prison wardens and tactical team commanders prior to each prison-wide shakedown (Doc. 481-17, p. 132; Doc. 481-20, pp. 38-41).[1] McAllister and/or White were present and supervised each tactical team at each facility where the shakedowns occurred (Doc. 481-6, p. 50; Doc. 481-17, p. 188).

Three separate briefings took place prior to each shakedown. White and/or McAllister would first discuss the plan with tactical team commanders, wardens, and assistant wardens, including how duties would be performed, what inmates would wear outside the cells, how inmates would be handcuffed, and how tactical team members would conduct themselves and handle inmates (Doc. 481-10, pp. 71-73, 75; Doc. 481-7, p. 37; Doc. 481-8, p 70; Doc. 481-11, pp. 71-73). Tactical team commanders and assistant commanders then discussed the shakedown plan

---

[1] The following were either Wardens, Assistant Wardens of Operations, tactical team commanders, or assistant tactical team commanders at the four relevant institutions: Jerry Witthoft, Frank Eovaldi, Kim Butler, Alex Jones, Robert Arnett, Brian Piper, Greg Gossett, Stephanie Dorethy, David Hermetz, Chris White, Ken Finney, Zachary Roeckeman, Robert Craig, Michael Gilreath, Timothy McAllister, Stephen Duncan, and Richard Moore. For purposes of this Memorandum and Order, the term "Defendants" refers only to these named parties.

with tactical team members (Doc. 481-11, pp. 65-68; Doc. 481-10, pp. 73-4, 101; Doc. 481-15, p. 73; Doc. 481-14, pp. 40-41). The entire group would then meet and the wardens, along with McAllister or White, would reiterate the plan (Pl. Ex. 8, pp. 75-76; Pl. Ex. 14, p. 40; Pl. Ex. 7, pp. 36-7). The shakedowns and tactical teams were monitored by White and/or McAllister along with the tactical team commanders, assistant commanders, and wardens of each prison. Yurkovich and Atchison communicated with each other and White daily during the shakedowns. Prior to the 2014 shakedowns, tactical teams were typically used in situations where force was required, such as cell extractions and riots (Doc. 481-5, pp. 14751-62).

Tactical team officers wore a distinctive uniform: an orange jumpsuit, vest, gloves, and helmet with face shield (*Id*. at 14796). They carried a baton, pepper spray, flashlight, and radio, among other things (*Id*.) Their uniform made it difficult to identify individual officers and they displayed no identifying insignia or name badge (*Id*.). Inmates referred to the tactical teams as "Orange Crush."

According to Plaintiffs and other inmates housed at the relevant institutions, the following occurred during the tactical team shakedowns (Doc. 481, pp. 10-14): Tactical team officers would enter living units while yelling loudly and banging their batons on the bars and railings of the unit. Once assembled, they would approach the cells and tell inmates to strip and remove their clothing. They would then direct a "reverse" strip search by ordering inmates to manipulate their genitals and buttocks and then direct them to put their hands in their mouths. Inmates were then directed to wear a shirt, pants, and shoes but no underwear. These searches were demeaning and unsanitary.

After they were searched, inmates were handcuffed behind their backs with their thumbs up and palms facing out – a position that was painful and uncomfortable. While their cells were searched, inmates were marched to a holding area in a "nuts to butts" fashion, where their genitals

would come into contact with the backside of the inmate in front of them.  While being marched in close formation, they were routinely pushed and shoved by tactical team members to ensure that they came into physical contact with other inmates.  They remained in holding areas (which included dining halls, gyms, or chapels) for 1 to 4 hours during which time they remained handcuffed and were either seated with their heads down or standing facing a wall.  After the cell searches, they were marched back to their living units in the same "nuts to butts" fashion.  All Defendants agree that the shakedowns occurred as planned. They deny however that the actions and events described by Plaintiffs occurred during the shakedowns.

Plaintiffs move for class certification under Rules 23(a) and 23(b)((3) of the Federal Rules of Civil Procedure and seek certification of the following class:[2]

> All prisoners housed at:
> Menard between April 4, 2014 and April 16, 2014;
> Illinois River between April 21, 2014 and April 29, 2014;
> Big Muddy between May 12, 2014 and May 19, 2014; or
> Lawrence between July 7, 2014 and July 11, 2014.

Plaintiffs' proposed class representatives are Jonathan Tolliver and Ronald Smith, who were housed at Menard, Demetrius Ross, who was housed at Illinois River, Kevin Hamilton, who was housed at Big Muddy, and Glenn Verser, who was housed at Lawrence.

## LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on

---

[2] Plaintiffs' proposed class seeks certification against the administrative defendants only: Salvador Godinez (Director); Joseph Yurkovich (Chief of Operations); Michael Atchison (Deputy Chief of Operations); David White (Statewide Tact Commander); Anthony McAllister (Southern Regional Tact Commander); Jerry Witthoft (Menard Tact Commander); Frank Eovaldi (Menard Assistant Tact Commander); Robert Arnett (Illinois River Tact Commander); Brian Piper (Illinois River Assistant Tact Commander); David Hermetz (Big Muddy Tact Commander); Chris White (Big Muddy Assistant Tact Commander); Ken Finney (Big Muddy Assistant Tact Commander); Michael Gilreath (Lawrence Tact Commander); Timothy McAllister (Lawrence Assistant Tact Commander); Kim Butler (Menard Warden);  Alex Jones (Menard Assistant Warden); Greg Gossett (Illinois River Warden); Stephanie Dorethy (Illinois River Assistant Warden); Zachary Roeckeman (Big Muddy Warden); Robert Craig (Big Muddy Assistant Warden); Stephen Duncan (Lawrence Warden); and Richard Moore (Lawrence Assistant Warden).

behalf of the individual named parties only." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 131 S. Ct. 2541, 2548, 180 L. Ed. 2d 374 (2011)).  A class must be "identifiable as a class," meaning the class definition must be definite enough that the class can be ascertained.  *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006); *see also Mullins v. Direct Dig., LLC*, 795 F.3d 654, 659–61 (7th Cir. 2015). Additionally, the plaintiff must satisfy the requirements of Federal Rule of Civil Procedure 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  *See* Fed. R. Civ. P. 23(a).  The proposed class must also fall within one of the categories set forth in Rule 23(b): "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior."  *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

Plaintiffs bear the burden of proving the proposed class satisfies Rule 23 and must do so through evidentiary proof; merely pleading the existence of the required elements will not suffice. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012); *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013).  However, "[i]t is sufficient if each disputed requirement has been proven by a preponderance of the evidence."  *Messner*, 669 F.3d at 811.

## DISCUSSION

To show that a class is ascertainable, a plaintiff must offer a definition that is (1) precise, (2) defined by objective criteria, and (3) not defined in terms of success on the merits.  *Mullins*, 795 F.3d at 659–60.  A class that is defined too vaguely fails to satisfy the "clear definition"

component. *Id*. at 660.  To avoid vagueness, a class definition needs to "identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Id.*

Plaintiffs' proposed class consists of individuals housed at four identified IDOC institutions during the period April 2014 through July 2014. This class definition is straightforward, specific, easily identifiable, and as such, meets the standard for ascertainability.

### Rule 23(a) Requirements
#### *Numerosity*

For numerosity, Plaintiffs must establish that a sufficient number of class members exist such that joinder would be impractical.  A plaintiff is not required to specify the exact number of persons in the class. *See Marcial v. Coronet Ins. Co.,* 880 F.2d 954, 957 (7th Cir. 1989) (citation omitted).  Rather, "[a] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit." *Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.,* 747 F.3d 489, 492 (7th Cir. 2014).  "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient." *Pruitt v. City of Chicago,* 472 F.3d 925, 926 (7th Cir. 2006).

Here, Plaintiffs propose a class consisting of 9,871 men who were housed at the relevant institutions during the relevant time period.  Clearly, a class of this size is sufficiently numerous to render joinder impracticable; thereby satisfying Rule 23(a)(1).

#### *Commonality*

To satisfy commonality, Plaintiff's "claims must depend on a common contention" and "[t]hat common contention…must be of such a nature that it is capable of classwide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Ordinarily, "[w]here the same conduct or practice by the same defendant gives rise

to the same kind of claims from all class members, there is a common question." *Suchanek v Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014). "Rule 23(a)(2) does not demand that every member of the class have an identical claim," and some degree of factual variation will not defeat commonality provided that common questions yielding common answers can be identified. *Spano*, 633 F.3d at 585; *see also Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir.1992).

Plaintiffs allege Defendants uniformly engaged in conduct and implemented the same or similar procedures at each of the four institutions where the Orange Crush shakedowns took place. Their claims arise under the same constitutional requirements and require resolution of key common factual and legal questions: whether Defendants developed and carried out a uniform policy and practice that had the effect of depriving the putative class members of their Eighth Amendment right to be free from cruel and unusual punishment; whether the shakedowns were executed in the manner Defendants contend or as Plaintiffs claim; whether Defendants engaged in a conspiracy to deprive the putative class members of their constitutional rights through the shakedowns; and whether Defendants knew of, approved, facilitated and /or turned a blind eye to the alleged unconstitutional shakedowns. These questions will generate common answers that will drive the resolution of this lawsuit. In particular, the answer to whether Defendants developed and carried out a uniform policy and practice that had the effect of depriving the putative class members of their Eighth Amendment right to be free from cruel and unusual punishment does not require individualized consideration and will resolve the liability aspect of this litigation and for each of the class claims.

For the most part, Defendants' arguments address the merits of Plaintiffs' claims rather than the sufficiency of the bases for class certification. For example, Defendants argue that their "articulated policy and practice" demonstrated a "constitutional plan to strip search inmates for a

proper penological purpose." They further argue that evidence, including Defendants' sworn statements, documentary evidence, and photographs demonstrate that no unconstitutional conduct occurred, and that sworn statements submitted on Plaintiffs' behalf should not be credited. While Defendants cite to sworn statements and transcripts of unsworn interviews indicating that some inmates did not remember or did not experience one or more of these alleged events, there is sufficient evidence of a common set of operative facts demonstrating uniform conduct towards members of the class. *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir.2009) ("[A] class will often include persons who have not been injured by the defendant's conduct.... Such a possibility or indeed inevitability does not preclude class certification...."). Finally, Defendants argue that only a few inmates filed grievances over the shakedowns, and fewer still exhausted their administrative remedies as to the claims in this lawsuit. Such arguments are appropriately raised on summary judgment; they are not relevant or determinative for class certification purposes. The proposed class meets the requirement for commonality.

### *Typicality*

"There must be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano*, 633 F.3d at 586. The typicality requirement addresses the separate concerns that (1) the representative's claim may fail on unique grounds, dooming meritorious claims of absent class members; or (2) the representative's claims may prevail on unique grounds, and the representative may therefore fail to adequately present alternative grounds under which the unnamed class members could prevail on their own claims. *See CE Design Ltd. v. King Architectural Metals, Inc*., 637 F.3d 721, 724 (7th Cir. 2011). Thus, typicality and adequacy inquiries often overlap. *See Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir.

A8

1999) (holding that if a plaintiff's claim is atypical, he is not likely to be an adequate representative).  Typicality is satisfied if the named representative's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and ... [the] claims are based on the same legal theory." *Rosario*, 963 F.2d at 1018. Typical does not mean identical, and the typicality requirement is liberally construed." *Ladegaard v. Hard Rock Concrete Cutters, Inc*., No. 00 C 5755, 2000 U.S. Dist. LEXIS 17832, *15 (N.D. Ill. Nov. 30, 2000).

In this case, the named Plaintiffs' claims, while not identical, are typical of the class.  Each alleges that during uniformly executed shakedowns, they and the putative class members, were subjected to humiliating and unsanitary strip searches and line movements and that they were subjected to uncomfortable and painful handcuffing and extended hours of uncomfortable standing or sitting; in violation of the Eighth Amendment.  Typicality is therefore satisfied.

### *Adequacy*

A representative party must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quotation omitted).  Plaintiff's Counsel have extensive experience representing plaintiffs in complex litigation and possess the ability, resources and experience necessary to prosecute this litigation, and the Court has no reason to believe they will not fairly and adequately represent the interests of the class.

As to class representatives, the adequacy requirement is satisfied when the named representative has "a sufficient interest in the outcome of the case to ensure vigorous advocacy"

and "[does] not have interests antagonistic to those of the class." *Saltzman v. Pella Corp.*, 257 F.R.D. 471, 480 (N.D.Ill. 2009) *aff'd*, 606 F.3d 391 (7th Cir. 2010)).  The named Plaintiffs are sufficiently interested in the outcome of the case and there's been no suggestion that they will not fairly and adequately represent the interests of the class.  Further, a review of the record reveals no apparent adverse interests between the named Plaintiffs and the putative class members.  The adequacy requirement is therefore satisfied.

### Rule 23(b) Requirements

Plaintiffs proceed under Rule 23(b)(3) which allows for certification upon a finding that "questions of law or fact common to members of the class predominate over any questions affecting only individual members," and also that "a class action is superior to other available methods for resolving the controversy." Fed. R. Civ. P. 23(b)(3).

### *Predominance*

"Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (quotation omitted).  "If, to make a *prima facie* showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question.  If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Id.* (quotation omitted).  Predominance "trains on the legal or factual questions that qualify each class member's case as a genuine controversy" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 624, (1997).

A10

In cases claiming the existence of widespread or uniform practices, courts have routinely found that common questions predominate. *See, e.g., Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) ("When a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation."); *Young v. County of Cook*, 2007 WL 1238920, at *7 (N.D. Ill. April 25, 2007) (same); *see also Hill v. County of Montgomery*, 2018 WL 3979590, at *14 (N.D.N.Y. Aug. 20, 2018) ("where plaintiffs are allegedly aggrieved by a single policy of the defendants' and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited" (internal quotation marks omitted)); *Snead v. CoreCivic of Tenn., LLC*, 2018 WL 3157283, at *16-17 (M.D. Tenn. June 27, 2018) (certifying Rule 23(b)(3) class of prisoners who alleged the existence of a widespread practice of denying certain medical care); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (certifying Rule 23(b)(3) class of prisoners who claimed they suffered unconstitutional conditions of confinement).

And, while the class members' particular experiences may vary to some degree, any such variation would primarily impact the type and amount of recoverable damages, assuming Defendants' liability is proven. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045, (2016) (citation and quotation marks omitted).

Defendants contend however that individual factual questions defeat Plaintiffs' claim of the existence of a uniform policy and/or practice and that those questions predominate over common issues. Specifically, Defendants argue that individualized inquiries into whether particular inmates were subjected to none, one, or more of the alleged offending actions; whether each Defendant was aware of these actions with respect to a particular Plaintiff; and whether each Defendant had the opportunity to intervene will be required. But once again, these questions go to the merits of the *common* constitutional claims. This Court finds that the common questions inherent in Plaintiffs' Eighth Amendment claims predominate over individualized questions.

### *Superiority*

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Given the number of putative class members and the common questions of law and/or fact that predominate over individual issues, a class action will certainly serve the economies of time, effort and expense and prevent possibly inconsistent results. Conversely, deciding each claim separately would be an extremely inefficient use of both judicial and party resources. Thus, class action is the superior method for adjudicating Plaintiffs' claims.

### Conclusion

For the foregoing reasons, Plaintiffs' Motion for Class Certification (Doc. 481) is **GRANTED** and the Court **CERTIFIES** the following class pursuant to Federal Rule of Civil Procedure 23:

> All prisoners housed at:
> Menard Correctional Center between April 4, 2014 and April 16, 2014;
> Illinois River Correctional Center between April 21, 2014 and April 29, 2014;
> Big Muddy Correctional Center between May 12, 2014 and May 19, 2014; or
> Lawrence Lawrence Correctional Center between July 7, 2014 and July 11, 2014.

A12

The Court **APPOINTS** Johnathan Tolliver (Menard), Ronald Smith (Menard), Demetrius Ross (Illinois River), Kevin Hamilton (Big Muddy), and Glenn Verser (Lawrence) as Class Representatives and **APPOINTS** Sarah Grady, Jon Loevy, Michael Kanovitz, Sam Heppell, Adair Crosley and the law firm of Loevy & Loevy; and Alan Mills, Elizabeth Mazur, Nicole Schult and the Uptown People's Law Center as Class Counsel.

**IT IS SO ORDERED.**

**DATED:  March 26, 2020**

**STACI M. YANDLE**
**United States District Judge**

A13

## CERTIFICATE OF FILING AND SERVICE

I certify that October 9, 2020, I electronically filed the foregoing Brief and Short Appendix of Defendants-Appellants with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

The other participants in this appeal, named below, are registered CM/ECF users, and thus will be served by the CM/ECF system.

Jon I. Loevy
jon@loey.com

Sam Heppell
sam@loevy.com

Sarah Copeland Grady
sarah@loevy.com

Michael Kanovitz
mike@loevy.com

Steven Edwards Art
steve@loevy.com

Alan S. Mills
alan@uplcchicago.org

Nicole Schult
nicole@uplcchicago.org

/s/ Kaitlyn N. Chenevert
KAITLYN N. CHENEVERT
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2127
kchenevert@atg.state.il.us