No. 20-1992

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

———————————

DEMETRIUS ROSS, KEVIN HAMILTON, RONALD SMITH,
JONATHAN TOLLIVER, and GLENN VERSER, on behalf of
themselves and a class of similarly situated persons,

*Plaintiffs-Appellees,*

*v.*

GREG GOSSETT, *et al.*,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court
for the Southern District of Illinois
No. 3:15-cv-0309—Staci M. Yandle, *Judge.*

---

**BRIEF OF PLAINTIFFS-APPELLEES**

---

Arthur Loevy
Jon Loevy
Michael Kanovitz
Sarah Grady*
Sam Heppell
Makeba Rutahindurwa
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

*Counsel of Record*

Alan Mills
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan Rd.
Chicago, IL 60640
(773) 769-1411

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

    and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Sarah Grady    Date: 1/11/2021

Attorney's Printed Name: Sarah Grady

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: 311 N. Aberdeen, 3rd FL

    Chicago, IL 60607

Phone Number: 312-243-5900    Fax Number: 312-243-5902

E-Mail Address: sarah@loevy.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Arthur Loevy      Date: 1/11/2021

Attorney's Printed Name: Arthur Loevy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** [ ]   **No** [✓]

Address: 311 N. Aberdeen, 3rd FL

Chicago, IL 60607

Phone Number: 312-243-5900      Fax Number: 312-243-5902

E-Mail Address: arhtur@loevy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

    and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Jon Loevy    Date: 1/11/2021

Attorney's Printed Name:  Jon Loevy

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]  No [✓]

Address:  311 N. Aberdeen, 3rd FL

    Chicago, IL 60607

Phone Number:  312-243-5900    Fax Number:  312-243-5902

E-Mail Address:  jon@loevy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Michael Kanovitz      Date: 1/11/2021

Attorney's Printed Name: Michael Kanovitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: 311 N. Aberdeen, 3rd FL

Chicago, IL 60607

Phone Number: 312-243-5900      Fax Number: 312-243-5902

E-Mail Address: mike@loevy.com

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Makeba Rutahindurwa          Date: 1/11/2021

Attorney's Printed Name: Makeba Rutahindurwa

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: 311 N. Aberdeen, 3rd FL

Chicago, IL 60607

Phone Number: 312-243-5900          Fax Number: 312-243-5902

E-Mail Address: makeba@loevy.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

n/a

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Sam Heppell    Date: 1/11/2021

Attorney's Printed Name:  Sam Heppell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☐    **No** ☑

Address:  311 N. Aberdeen, 3rd FL

Chicago, IL 60607

Phone Number:  312-243-5900    Fax Number:  312-243-5902

E-Mail Address: sam@loevy.com

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

n/a

Attorney's Signature: /s/ Alan Mills          Date: 1/11/2021

Attorney's Printed Name:  Alan Mills

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [ ]   No [✓]

Address: 4411 N. Sheridan

Chicago, IL 60640

Phone Number: 773-769-1411          Fax Number: 773-769-2224

E-Mail Address: alan@uplcchiago.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 20-1992

Short Caption: Ross et al., v. Gossett el al.,

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Demetrius Ross, Kevin Hamilton, Ronald Smith, Jonathon Tolliver, and Glenn Verser on behalf of themselves

    and a class of similarly situated persons

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy, Uptown Peoples' Law Cener

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        n/a

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        n/a

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    n/a

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    n/a

Attorney's Signature: /s/ Nicole Schult        Date: 1/11/2021

Attorney's Printed Name:  Nicole Schult

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [ ]    **No** [✓]

Address:  4411 N. Sheridan

    Chicago, IL 60640

Phone Number: 773-769-1411        Fax Number: 773-769-2224

E-Mail Address: nicole@uplcchicago.org

# TABLE OF CONTENTS

Jurisdictional Statement ............................................................................... 1

Statement of the Issues ............................................................................... 1

Statement of the Case ............................................................................... 1

I.      The 2014 Shakedowns ..................................................................... 1

        A.      Appellants Create a Common Plan to Conduct Shakedowns ................ 1

        B.      Appellants Execute Their Common Plan in Uniform Fashion ............... 4

        C.      The Shakedowns Violated Class Members' Constitutional Rights ........ 7

II.     Procedural History ......................................................................... 11

Summary of the Argument ........................................................................ 15

Standard of Review ................................................................................... 17

Argument .................................................................................................. 18

I.      The District Court Properly Determined that Common
        Questions Susceptible to Resolution on a Classwide Basis Existed ............... 18

        A.      Establishing Commonality Did Not Require
                Plaintiffs to Prove Their Success on the Merits of Their Claims ......... 20

        B.      Plaintiffs Have Presented Substantial Evidence that the
                Common Plan Crafted by Appellants Existed as They Contend .......... 26

                1.      Appellants Forfeited their Numerical Sufficiency
                        Argument by Failing to Present it to the District Court .......... 27

                2.      Plaintiffs Submitted Substantial Evidence of Uniformly
                        Abusive and Humiliating Shakedowns Planned by Appellants 28

                3.      Plaintiffs' Firsthand Descriptions of the Shakedowns Yield a
                        Consistent Account of an Abusive and Humiliating Operation
                        that was Uniformly Executed According Appellants' Plan ........ 31

II.     Plaintiffs Satisfied Rule 23(a)(3)'s Typicality Requirement ............................ 36

III.    The Common Questions Predominate Over Individualized Issues ................ 40

    A.    The Predominant Common Questions of Appellants' Liability
          Will Cause the Class to Prevail or Fail in Unison ................................ 41

    B.    Section 1983's Personal Involvement Requirement Does
          Not Preclude a Predominance Finding Against Defendants ............... 47

    C.    Individual Damages Determinations Do Not Preclude
          Certifying a Class ................................................................................. 49

Conclusion ........................................................................................................... 51

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ........................................................... 21, 24, 27, 34, 44, 47

*Alioto v. Town of Lisbon*, 651 F.3d 715 (7th Cir. 2011) ............................................. 29

*Backes v. Vill. of Peoria Heights*, 662 F.3d 866 (7th Cir. 2011) ................... 24, 26, 50

*Beaton v. SpeedyPC Software*, 907 F.3d 1018 (7th Cir. 2018) ...................... 19, 25, 43

*Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015) ....... 19, 25, 34, 44, 46, 49

*Bennett v. Dart*, 953 F.3d 467 (7th Cir. 2020)............................................................ 21

*Blyden v. Mancusi*, 186 F.3d 252 (2d Cir. 1999) .................................................. 51-52

*Bowman v. Korte*, 962 F.3d 995 (7th Cir. 2020) ......................................................... 6

*Brokaw v. Mercer Cnty.*, 235 F.3d 1000 (7th Cir. 2000) ........................................... 45

*Brown v. Kelly*, 609 F.3d 467 (2d Cir. 2010) ............................................................. 48

*Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013) ................................. 44

*Butler v. Suffolk Cnty.*, 289 F.R.D. (E.D.N.Y. 2013) ...................................... 48, 52-53

*Calhoun v. DeTella*, 319 F.3d 936 (7th Cir. 2003).................................... 22, 26, 45, 47

*Chicago Teachers Union v. Bd. of Educ. of City of Chicago*,
797 F.3d 426 (7th Cir. 2015)................................................................ 20, 23, 43

*Childress v. Walker*, 787 F.3d 433 (7th Cir. 2015) ......................................... 44-45, 50

*CNH Indus. Am. LLC v. Jones Lang LaSalle Americas, Inc*,
882 F.3d 692 (7th Cir. 2018)............................................................................ 29

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................ 53

*Costello v. BeavEx., Inc.*, 810 F.3d 1045 (7th Cir. 2016) .......................................... 25

*Cranberry Growers Coop. v. Layng*, 930 F.3d 844 (7th Cir. 2019)............................ 29

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................ 26, 45

*Graber v. Clarke*, 763 F.3d 888 (7th Cir. 2014) ........................................................ 20

*Henry v. Hullett*, 969 F.3d 769 (7th Cir. 2020) (en banc) ........................................... 44

*Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012) ..................... 30

*Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883 (7th Cir. 2011) .............. 19

*King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015)................................................. 44

*Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ............................ 34

*Lacy v. Cook Cnty.*, 897 F.3d 847, 863 (7th Cir. 2018) ........................................ 19, 39

*Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) ..................................... 22, 44

*McFields v. Dart*, 982 F.3d 511, 516 (7th Cir. 2020) ................................................ 21

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012)... 21, 28, 43

*Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849 (7th Cir. 2017) ............. 19, 52

*Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020) .................................................... 19

*Oshana v. Coca-Cola Co.*, 472 F.3d 506 (7th Cir. 2006)....................................... 38-39

*Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843 (7th Cir. 2015) ...... 29

*Rosado v. Gonzalez*, 832 F.3d 714 (7th Cir. 2016)................................................... 22

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ................................................ 39

*Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001)............................................ 46

*Scherer v. Balkema*, 840 F.2d 437 (7th Cir. 1988)................................................... 22

*Snead v. CoreCivic of Tenn., LLC* (M.D. Tenn. June 27, 2018) ............................... 48

*Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011)...................................... 33, 39

*Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609 (N.D. Ill. 2009) ........................... 48

*Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014) ...................... 23, 32, 48

*Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000 (7th Cir. 2018)................................ 30

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ___, 136 S. Ct. 1036 (2016)............. 43, 52

*United States v. United States Gypsum Co.*, 333 U.S. 364 (1948) ............................ 20

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .............. 19-20, 27, 30, 32,42, 51

**Rules & Statutes**

Fed. R. Civ. P. 23(f) .................................................................................................. 2

42 U.S.C. § 1983 ................................................................................................. 13, 50

## JURISDICTIONAL STATEMENT

Defendant-Appellant's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUES

1.     Whether the district court abused its discretion when it determined that Plaintiffs' constitutional claims presented questions that were common to the proposed class and capable of being answered in common fashion?

2.     Whether the district court abused its discretion when it determined that the claims of the named class representatives were typical of the proposed class?

3.     Whether the district court abused its discretion when it found that the common questions in the proposed liability class predominated over individual ones in a proposed liability class?

## STATEMENT OF THE CASE

### I.     The 2014 Shakedowns

#### A.     Appellants Create a Common Plan to Conduct Shakedowns

In 2014, Joseph Yurkovich, the Chief of Operations for the Illinois Department of Corrections (IDOC), and Michael Atchison, IDOC's Deputy Chief of Operations, decided to perform prison-wide searches at several prisons throughout Illinois as part of a "spring cleaning" initiative to remove unwanted items from the prisons, ranging from trash and excess property, to serious contraband. R.481-16 at 93:16-94:10; R.481-69 at 2. Atchison and Yurkovich testified that they initiated these prison-wide searches (referred to as "shakedowns") not because of any particular concern, but

simply because the prisons "hadn't been searched on a facility-wide scale in a long time." R.481-6 at 46:1-10; R.481-16 at 103:23-104:15.

Yurkovich and Atchison enlisted a special operations unit—the IDOC tact teams—to execute the shakedowns. R.481-6 at 47:21-49:8; R.481-71 at 2-3. The tact teams are typically utilized (or "activated") in situations where force is almost certain to be used. R.486-1 at 6-17, 50. Tact team members wear an orange jumpsuit, a vest, a helmet with a face shield, gloves, a 3-foot baton, pepper mace, a flashlight and a radio. R.481-7 at 38:21-39:2, R.486-1 at 51. Their uniforms are designed to conceal the identity of tact team members—the headgear obstructs easy visual recognition and the orange jumpsuits omit any identifying insignia like a name badge. R.481-7 at 39:5-11, R.486-1 at 51; R.486-28 at 1-2. Correctional staff and prisoners alike colloquially refer to the tact team as "Orange Crush." R.481-162:16-163:17.

In 2014, the tact teams were chiefly run by a Statewide Tact Commander, David White, with assistance from the Southern Regional Tact Commander, Anthony McAllister. R.481-7 at 24:13-23, 32:6-8; R.481-17 at 13:7-10, 56:14-16. Yurkovich and Atchison communicated their decision to conduct the shakedowns to White and McAllister shortly after conceiving of the plan, and tasked White, with help from McAllister, with the responsibility to plan and execute the shakedowns. R.481-6 at 54:3-7; R.481-7 at 30:13-23, 70:2-15; 73:4-74:4; R.481-16 at 117:11-11:22; R.481-17 at 114:23-115:14. Final approval of the plans remained with Yurkovich, Atchison, and S.A. Godinez, the Director of the IDOC. R.481-6 at 33:12-22, 46:11-16, 107:20-108:2; R.481-16 at 100:5-16; R.481-72 at 2.

White and McAllister created so-called "operations orders" that set forth general information about the shakedowns, including where each day's shakedown would take place and how many tact team members would be needed. R.481-6 at 54:3-7, 54:20-55:16; R.481-7 at 70:1-5; R.481-17 at 85:19-86:13; R.481-66; R.486-27. But those written documents omitted details about *how* the shakedowns would be performed, including how strip searches would be conducted, and how the incarcerated men would be marched from their cell houses to another location. See, e.g., R.481-66 at 2-5. For example, despite Appellants' admission that tact team officers were instructed to enter the living units of the prison "by banging batons on cell bars[,]" Br. at 7, this detail is wholly absent from any of the operations orders. Other aspects of the shakedowns that Appellants concede were part of the plan are contradicted by the text of the orders themselves, including the requirement that prisoners not be permitted to don underwear following the strip searches. Compare Br. at 8 (admitting that "inmates were told not to put on underwear"), with R.481-66 at 4 (indicating that prisoners could don "[u]nderwear" among other clothing items during the shakedown). And Appellants admit that most of the tact team members who conducted the shakedowns never saw the operations orders, but instead were told about Appellants' plan and the details of the shakedown operation verbally during meetings with Appellants before the shakedowns began. R.481-7 at 1-11.

In addition to the operations orders, Yurkovich and Atchsion had a series of "very in-depth conversations" with White and McAllister to discuss the details of the plan to conduct the shakedowns. R.481-6 at 47:21-48:7, 48:23-49:8; R.481-70 at 2;

R.481-71 at 2-3. Yurkovich, Atchison, White, and McAllister also had several meetings with the wardens and assistant wardens of operations of the targeted prisons, who retained supervisory responsibilities over tact operations within their facilities. R.481-7 at 88:7-9, 119:2-120:2; R.481-17 at 132:5-20; R.481-20 at 38:21-41:6. Together, these individuals created a plan to conduct the shakedowns in uniform fashion at each IDOC facility, with only minor variations based on each prison's physical layout. R.481-16 at 139:21-140:22; R.481-66 at 2-57.

The shakedowns at issue in this lawsuit concern those conducted at Menard in early April 2014, R.481-66 at 2-42, at Illinois River in late April 2014, *id.* at 46, at Big Muddy River in May 2014, *id.* at 50, and at Lawrence in July 2014, *id.* at 54.

## B.    Appellants Execute Their Common Plan in Uniform Fashion

Once the plan was in place, White and McAllister travelled to Menard, Illinois River, Big Muddy River, and Lawrence to ensure that the shakedowns were conducted pursuant to the plan. R.481-6 at 50:6-12; R.481-7 at 35:19-36:9; R.481-17 at 187:4-6, 188:4-13, 222:9-21, 256:21-258:4. Each shakedown took multiple days to complete, although the total number of days required varied based on the size of the prison and the number of incarcerated individuals housed there. See R.481-66 at 2-42, 46, 50, 54. But each day of each shakedown began the same way: with a 5-15 minute "briefing" during which White and/or McAllister would communicate the plan to the facility-level commanders and assistant commanders of the tact team, who in turn communicated the plan to the other members of the tact team. R.481-7 at 37:4-6; R.481-8 at 70:15-20; R.481-10 at 71:3-74:11, 75:20-23, 101:4-13; R.481-11 at 65:14-

4

67:8; R.481-14 at 40:6-41:10; R.481-15 at 73:1-6. These briefings were highly detailed, including directions on "how you would perform your duties of the day," "what [prisoners] could wear out of the cell," "[h]ow you was to cuff," and "[h]ow they were to . . . conduct their self, how to handle the inmates," among others. R.481-11 at 71:3-73:11.

After every member of the tact team had been told about the common plan, the group would convene for a mass group briefing, delivered by the warden or assistant warden of operations, or McAllister or White, to reiterate the shakedown plan. R.481-8 at 75:19-76:12; R.481-14 at 40:6-41:10. The purpose of this detailed and repetitive briefing was to ensure that the common plan was executed in uniform fashion for each day of each shakedown. R.481-10 at 76:11-77:19; R.481-11 at 65:4-13; R.481-14 at 41:11-14.

White or McAllister attended each day of each shakedown. R.481-6 at 50:6-12; R.481-7 at 35:19-36:9; R.481-17 at 187:4-6, 188:4-13, 222:9-21, 256:21-258:4. White was the primary supervisor of the shakedowns at Menard, although McAllister was there for 1-4 days to supervise. R.481-17 at 222:9-21. White was also the primary supervisor at Illinois River, while McAllister primarily supervised the shakedowns at Big Muddy River and Lawrence. R.481-17 at 187:4-6, 256:21-257:11, 257:23-258:4, 264:15-265:4. White and McAllister accompanied the tact team members as they conducted the shakedown, supervising the operation to ensure that "everything was going as planned" and the tact team was conducting the shakedown in uniform fashion. R.481-7 at 35:19-36:9, 62:23-63:17; R.481-8 at 43:16-49:7, 79:15-19; R.481-11

5

at 116:7-120:11, 122:13-24; R.481-79 at 3. Each prison's facility-level tact commander and assistant commander were also responsible for monitoring their subordinate tact members to ensure that the shakedown plan was being followed. R.481-7 at 79:10-19; R.481-8 at 80:15-81:22, 86:9-87:8, 89:7-22; R.481-10 at 107:22-109:2; R.481-11 at 123:18-124:10; R.481-14 at 62:1-14; R.481-80 at 3-4; R.481-81 at 2; R.481-82 at 3. Finally, each facility's warden and/or assistant warden of operations also attended many of the shakedowns at his or her facility. R.481-18 at 65:18-68:17; R.481-19 at 144:2-13, 148:3-16; R.481-20 at 72:18-73:5; R.481-83 at 3. These wardens acknowledged they attended the shakedowns in part because they remained responsible for the conduct of IDOC employees within their facility. R.481-18 at 105:12-20; R.481-19 at 179:23-180:5; R.481-20 at 17:4-16.

Yurkovich and Atchison also maintained close supervision over the shakedown operations. They had daily conversations about the shakedowns during the periods that they were underway, and Atchison had regular conversations with White about the shakedowns through in-person meetings, phone calls, and email exchanges. R.481-6 at 43:10-44:24, 82:5-18; R.481-16 at 178:5-179:5, 251:8-20. Appellants testified that during their close supervision of the shakedowns, they saw no deviation from the common plan. R.481-10 at 107:17-21; R.481-14 at 48:15-49:1, 61:14-62:14; R.481-15 at 129:4-11; R.481-17 at 281:18-282:10; R.481-18 at 68:7-11; R.481-19 at 184:8-185:15; R.481-26 at 65:10-18; R.481-82 at 6; R.481-84 at 6. And 300 tact team members similarly stated that they saw no member of the tact team (including themselves) act contrary to the common plan that had been communicated to them

during the briefings. See generally R.481-48; R.481-49; R.481-50; see also R.481-88 at 2-17 (spreadsheet documenting in numerical format the 300 survey responses).

## C.    The Shakedowns Violated Class Members' Constitutional Rights

The parties agree that the shakedowns at issue were conducted pursuant to a common plan that was executed in uniform fashion. R.491 at 14; Br. at 6-9. And the evidence from class members demonstrates that Defendants' execution of the plan violated the constitutional rights of class members.

As each shakedown began, the tact team entered the living unit by yelling loudly and banging their batons on the bars and railings of the unit.[1] Once the tact team was assembled in the living unit, they approached each class member at their cell and ordered them to strip.[2] After their clothing was removed, class members were ordered to conduct a demeaning and unsanitary "reverse" strip search, meaning that they were forced to manipulate their genitals and buttocks before (as opposed to after)

---

[1] R.481-31 at 43:10-22; R.481-33 at 62:1-67:9; R.481-32 at 41:4-45:7; R.481-29 at 45:18-48:13; R.481-30 at 38:16-39:11; R.481-34 at 66:10-75:23; R. 481-35 at 35:23-36:1; R.481-36 at 30:1-10, 50:20-51:1; R.481-37 at 41:23-42:29; R.481-38 at 21:13-18, 62:17-63:12; R.39 at 13:11-15; R.481-40 at 77:1-5, 81:17-20; R.481-41 at 24:10-13, 27:2-5, 28:8-10; 481-42 at 32:18-37:14; R.481-43 at 26:2-3; R.481-44 at 33:12-34:19; R.481-45 at 42:8-20; R.481-46 at 34:12-14; R.481-47 at 55:16-56:2; R.481-52 at 2:8; R.481-53 at 2:32; R.481-56 at 2:43; R.481-57 at 1:52; R.481-58 at 2:16; R.491-7 at 91-93, 107-109, 125-126, 129-130, 138-140, 161-163, 171-179; R.481 at 10 n.4 (citing declarations submitted at R.481-51).

[2] R.481-31 at 55:4-7; 481-33 at 73:1-78:15; R.481-32 at 48:13-16; R.481-29 at 45:18-48:13, 51:1-54:17; R.481-30 at 41:11-42:13; R.481-34 at 66:10-75:23; R.481-35 at 21:21-23:13, 33:16, 45:1-53:24; R.481-36 at 30:14-24; R.481-37 at 47:14-48, 15: R.481-38 at 24:2-4; R.481-39 at 13:21-24; R.481-40 at 93:17-22; R.481-41 at 30:13-31:18; R.481-42 at 37:15-46:1; R.481-43 at 24:12-15;R.481-44 at 36:14-37:3; R.481-45 at 49:1-50:6; R.481-46 at 37:17-42:3; R.481-47 at 63:19-34:11; R.481 at 10 n.5 (citing declarations submitted at R.481-51).

putting their hands in their mouths.[3] After being strip searched, the class members were ordered to put on their prison shirt, pants, and shoes, but they were not allowed to wear underwear.[4]

After the strip searches were completed, class members were handcuffed in a needlessly painful and uncomfortable manner behind their backs, with their palms facing out.[5] They were then forced to march to a holding area, where they stood or sat while the tact team searched their cells. Class members report that they were forced to march in close formation with prisoners in front and behind such that their heads and their genitals and were forced to make physical contact with the prisoner in front of them, and that the heads and the genitals of the prisoner behind them

---

[3] R.481-31 at 56:19-57:5; R.481-33 at 73:1-78:15; R.481-32 at 58:8-12; R.481-29 at 51:1-54:17; R.481-30 at 42:14-42:23; R. 481-34 at 66:10-75:23; R.481-36 at 54:14-24, 74:20-75:11; R.481-37 at 47:14-48:15; R.481-38 at 26:4-16; R.481-39 at 14:4-11, 22:19-23:15, 37:21-38:3; R.481-40 at 96:2-5, 110:11-18; R.481-41 at 30:13-31:18; R.481-42 at 37:15-46:1; R.481-43 at 29:13-18, 30:10-12; R.481-44 at 36:14-37:3; R.481-45 at 419:1-50:6; R.481-46 at 40:23-41:15, 84:13-19; R.481-47 at 63:19-64:11; R.481-54 at 2:14; R.481-53 at 3:45; R.481-59 at 3:28, 9:18; R.481-63 at 2:32; R.481 at 11 n.6 (citing declarations submitted at R.481-51).

[4] R.481-31 at 56:19-57:5; R.481-30 at 44:15-45:3; R.491-35 at 33:16, 45:1-53:24, 56:2-59:22; R.481-36 at 72:8-73:6; R.481-37 at 47:14-48:15; R.481-38 at 27:3-13; R.481-39 at 14:24-15:1, 25:7-8; R.481-40 at 111:18-20; R.481-41 at 37:4-7; R.481-42 at 37:15-46:1; R.481-43 at 61:2-9; R.481-44 at 36:14-37:3; R.481-45 at 52:15-49; R.481-46 at 42:4-22, 83:47-19; R.481-47 at 133:14-21; R.481 at 11 n.7 (citing declarations submitted at R.481-51).

[5] R.481-31 at 60:20-61:6; R.481-33 at 78:16-81:18; R.481-32 at 63:23-64:01; R.481-29 at 55:11-64:10; R.481-30 at 46:15-19; R.481-34 at 77:1-2, 77:10-11; R.481-35 at 21:21-23:13, 45:1-53:24; R.481-36 at 64:23, 77:4-78:1; R.481-37 at 51:3-8, 51:22-52:18; R.481-38 at 28:3-9' R.481-39 at 15:9-13; R.481-40 at 115:17-20, 116:5-117:6; R.481-41 at 32:11-13, 38:17-20; R.481-42 at 45:5-50:19; R.481-43 at 33:9-12; R.481-44 at 36:14-37:3; R.481-45 at 53:24-54:16. 101:15-103:2; R.481-46 at 43:2-44:21, 43:11-44:9; R.481-47 at 66:6-19; R.481 at 12 n.8 (citing declarations submitted at R.481-51).

made contact with their backsides.[6] Many reported being told to line up "nuts to butts."[7] Class members were also forcibly pushed and shoved by the tact team to ensure that they were in physical contact with one another.[8]

Once the men reached the holding area, they were forced to sit or stand handcuffed behind their backs for a lengthy period—despite there being no need for the painful stress positions. Although different spaces were used as holding areas (e.g., some were held in a dining area, while others were held in a gym or chapel) and there is some variation in regard to what they were ordered to do once in the holding

---

[6] R. 481-31 at 74:10-18, 147:2-16; R.481-33 at 62:1-67:9, 92:1-97:15, 98:6; R.481-29 at 68:7-79:14; R.481-30 at 50:14-51:13, 55:19-56:5; R.481-36 at 44:22-45:23, 88:18-24, 89:1-21, 93:3-94:24; R.481-37 at 61:18-62:2, 64:13-22, 69:23-70:24; R.481-38 at 33:2-12, 62:17-63:12; R.481-39 at 62:17-63:12; R.481-40 at 130:9-131:7, 138:1-2, 144:5-7; R.481-41 at 42:4-7, 44:5-23, 45:21-46:3, 49:1-19, 62:4-9, 73:17-23, 76:5-77:5; 481-42 at 63:3-71:18; R.481-43 at 35:9-13, 38:10-13, 38:10-13, 39:9-20, 40:2-7; R.481-44 at 46:20-50:1, 77:24-78:10; R.481-45 at 67:13-68:14, 70:2-71:6; R.481-46 at 56:2-59:5; R.481-47 at 115:7-120:3; R.481 at 12 n.9 (citing declarations submitted at R.481-51).

[7] R.481-36 at 44:22-46:15, 62:19-21, 85:9-23, 127:18-128:18, 130:11-15; R.481-38 at 62:17-63:4; R.481-34 at 62:25-64:25; R.481-32 at 34:21-36:7, 65:12-67:14, 71:17-72:7, 83:3-9; R.481-40 at 71:12-21, 209:11-21; R.481-41 at 42:3-10, 49:7-51:4, 61:23-62:9, 73:14-23, 76:3-12, 81:24-82:7; R.481-42 at 30:24-31:17, 63:3-7, 66:6-14, 72:6-9, 82:12-17; R.481-44 at 32:5-17, 43:11-13, 44:14-21, 46:20-22, 48:13-22, 65:14-66:1; R.481-45 at 67:13-68:10, 83:21-84:8; R.481-31 at 39:9-40:6, 74:10-75:11; R.481-30 at 50:14-51:9, 52:24-56:5, 73:5-22; R.481-37 at 61:22-24, 64:13-22, 66:12-67:6, 71:16-21; R.481-33 at 62:1-65:1; R.481-35 at 37:11-23, 40:16-24; R.481-51 at 138.

[8] R.481-31 at 74:10-18, 110:14-112:15, 86:20-89:1, 90:2-94:11; R.481-33 at 78:16-81:18, 86:23, 92:1-97:15, 98:6, 104:14-109:1,110:22-112:16, 114:6; R.491-29 at 55:11-64:10, 68:7-79:14, 83:8-94:3, 94:4-113:15; R.481-30 at 51:23-52:11, 55:19-56:5, R.491-34 at 83:15-85:6, 89:13-99:22; R.481-35 at 21:21-23:13, 25:4-26:13, 26:20+-29:13, 33:16, 45:1-53:24; R.481-36 at 85:13-86:3; R.481-37 at 34:8-17, 60:18-23, 68:24-69:22; R.481-38 at 33:13-35:3, 42:14-48:14; R.481-40 at 113:2-22, 115:17-20, 199:20-9, 120:9-10, 129:16-17, 144:5-7, 157:2-158:11, 178:22-180:8; R.481-41 at 39:24-40:08, 46:21-47:5, 49:1-19, 51:1-11, 54:10-20, 54:4-57:3, 57:6-59:1, 59:2-24, 60:1-61:12, 71:22-72:1, 73:17-23, 74:9-76:2, 76:5-77:5; R.481-42 at 51:15-61:10, 71:19-81:22; R.481-43 at 35:21-24, 35:9-13, 41:20-42:12; R.481-44 at 46:20-50:1, 50:7-56:11; R.481-45 at 65:21-66:1; 69:4-70:1, 75:4-19; R.481-46 at 55:19-56:8, 56:16-24; R.481-47 at 73:5-24, 75:21-76:17, 72:21-83:4 R.481 at 13 n.11 (citing declarations submitted at R.481-51).

area (e.g., some sat at tables with their head down while others were forced to stand with their heads against a wall), nearly all class members remained painfully handcuffed for an unnecessarily long period of time, from one to four hours.[9] After the cell searches were complete, the class was ordered to march back to their cells in the same close "nuts to butts" formation.[10]

Appellants dispute some aspects of the shakedown, although they admit some others. Appellants acknowledge, for example, that they instructed tact team members to enter class members' living units while yelling loudly and banging their batons on the bars and railings in the units. Br. at 7. Appellants admit that they told tact team members not to let class members wear underwear, and to handcuff class members in the painful and uncomfortable manner that they have described with their palms facing outward. *Id.* at 8. Appellants also admit that they told tact team members to order class members to march "in close formation with their heads down and wearing handcuffs[,]" although they dispute that they instructed tact team members to order class members to make physical contact with, or to forcibly place class members' heads onto the backs of, the man ahead of them in line. *Id.* at 8-9. Appellants admit

---

[9] R.481-31 at 102:16-104:11; R.481-29 at 83:-8-94:3; R.481-34 at 89:13-99:22; R.481-35 at 61:22-63:17; R.481-36 at 121:20-23; R.481-37 at 78:13-21; R.481-38 at 35:13-22; R.481-40 at 165:17-18; R.481-41 at 70:18-21; R.481-42 at 71:19-81:22; R.481-43 at 46:14-18; R.481-44 at 56:18-65:2; R.481-45 at 79:6-9; R.481-46 at 61:21-23; R.481-47 at 92:7-10; R.481 at 14 n.12 (citing declarations submitted at R.481-51).

[10] R.481-31 at 110:14-112:15; R.481-33 at 117:22-119:17; R.481-36 at 127:12-128:8; R.481-37 at 89:22-91:17; 93:4-94:20; R.481-40 at 177:4-7; R.481-41 at 73:17-23; R.481-42 at 81:23-85:12; R.481-43 at 48:14-17; R.481-44 at 65:3-67:19; R.481-45 at 83:24-85:19; R.481-46 at 68:9-13; R.481 at 15 n.13 (citing declarations submitted at R.481-51).

that their plan included required class members to stand or sit with their heads down while in the common area of the prison. *Id.* at 9. Appellants contend that each of these aspects of the shakedowns were "authorized" by IDOC policy, Br. at 7-9, but the record contains no such policies.

In sum, the parties agree (1) that Appellants crafted a common plan to conduct shakedowns at Menard, Illinois River, Big Muddy River, and Lawrence, (2) that they communicated their common plan to the tact team members responsible for executing it, (3) that Appellants took action to ensure that the shakedowns were executed in uniform fashion consistent with the plan, and (4) that the execution was uniform and consistent with the plan. And given Appellants' admissions, numerous aspects of the contents of the common plan are additionally undisputed.

## II. Procedural History

On March 19, 2015, Plaintiff Demetrius Ross filed this lawsuit on behalf of himself and a putative class of men incarcerated at Menard, Illinois River, Big Muddy River, and Lawrence who had been subjected to the 2014 shakedowns. R.1. Ross's Complaint alleged that the shakedowns violated class members' Eighth Amendment rights, as well as their rights under federal and state law. R.1 ¶¶ 46-87. Relevant to this appeal, Ross's Complaint brought claims pursuant to 42 U.S.C. § 1983 against Defendants for conducting the shakedowns in violation of the Eighth Amendment, conspiring to violate class members' Eighth Amendment rights, and failing to intervene to protect class members' Eighth Amendment rights. *Id.* ¶¶ 46-71.

Jonathan Tolliver, Kevin Hamilton, Glenn Verser, and Ronald Smith were added as named plaintiffs in the Second Amended Complaint filed in the case. R.197 ¶¶ 8-13.[11] That Second Amended Complaint named as defendants each member of the tact team who had conducted the shakedowns at issue, as well as the supervisory individuals who have brought this appeal. *Id.* at 1-3. During the course of discovery, the district court also consolidated 20 cases that were independently filed *pro se* by putative class members over the abusive and humiliating shakedowns that they had suffered. R.481 at 37 n.18 (listing cases).

In 2018, Plaintiffs filed a motion to certify a Rule 23(b)(3) class of prisoners housed at Menard, Illinois River, Big Muddy River, and Lawrence on the dates that the 2014 shakedowns were conducted at each prison. R.481 at 22. Plaintiff sought certification against the 22 supervisors who were responsible for planning, executing, and supervising the shakedowns on the question of their liability under section 1983 for facilitating or condoning the unconstitutional shakedowns, conspiring to violate class members' Eighth Amendment rights, and failing to intervene to prevent the constitutional violations inflicted by the tact team as part of the shakedowns. *Id.* at 22-23. In support of their motion, Plaintiffs submitted evidence from 108 class members about the humiliating and abusive shakedowns that they endured. R.481-29 through R.481-47; R.481-51; R.481-52; R.481-97; R.491-7 at 12-15, 42-44, 60-66, 91-93, 107-109, 121-122, 125-126, 129-130, 138-140, 161-163, 166-168, 171-173, 176-

---

[11] Two other individuals (Zachary Watts and James Dunmore) were added as named plaintiffs in the Second Amended Complaint, but they did not request appointment as class representatives in Plaintiffs' class certification motion. See R.197 ¶¶ 11-12.

179, 182-183. Plaintiffs also submitted testimony and statements from the 22 supervisors and other IDOC staff, who agreed that a common plan had been developed for the shakedowns and that the shakedowns had been executed in uniform fashion consistent with the plan. R.481-10 at 107:17-21; R.481-14 at 48:15-49:1, 61:14-62:14; R.481-15 at 129:4-11; R.481-17 at 281:18-282:10; R.481-18 at 68:7-11; R.481-19 at 184:8-185:15; R.481-26 at 65:10-18; R.481-48; R.481-49; R.481-50; R.481-88 at 2-17; R.481-82 at 6; R.481-84 at 6.

Appellants opposed class certification, arguing that Plaintiffs could not meet Rule 23's commonality, typicality, and predominance requirements. R.491 at 3-4. Appellants agreed that there was a common plan that had been executed in uniform fashion. *Id.* at 14 (arguing that their evidence "articulat[ed] the actual uniform policy and practice used during the shakedowns" conducted for "a proper penological purpose"). But they contended, as they have in this appeal, that only Appellants' version of that common plan could be credited, and any issues experienced by class members were "[a]t most" or "at worst" a one-off deviation from the constitutional common plan that happened despite Appellants' instructions and without their knowledge. Br. at 33; R.491 at 36; see also R.491 at 16-18. Based on this premise, Appellants argued that any claims of improper conduct by tact team members would have to be examined individually and thus Rule 23's commonality, typicality, and predominance requirements were lacking. R.491 at 16-18, 34-36.

The district court granted Plaintiffs' motion for class certification. A.1. After thoroughly assessing the record and both sides' arguments, the district court

concluded that Plaintiffs had satisfied Rule 23(a)(2)'s commonality requirement because there was "sufficient evidence of a common set of operative facts demonstrating uniform conduct towards members of the class." A.8. The district court determined that there were multiple common questions that would generate common answers and resolve liability on the entire class's constitutional claims against the Appellants. A.7. Those questions included: whether Appellants developed and executed a common plan that violated the Eighth Amendment rights of class members, whether the admittedly uniform shakedowns occurred as Appellants claimed or instead as Plaintiffs claimed, whether Appellants entered into an agreement with one another to violate class members' constitutional rights through the shakedowns, and whether Appellants approved, facilitated, or turned a blind eye to the violations of class members' constitutional rights through the uniform shakedowns. A.7.

The district court also found that Plaintiffs had sufficiently established Rule 23's typicality requirement by demonstrating that "during uniformly executed shakedowns, they and the putative class members[] were subject to humiliating and unsanitary strip searches and line movements and that they were subjected to uncomfortable and painful handcuffing and extended hours of uncomfortable standing or sitting; in violation of the Eighth Amendment. A.9. Finally, the district court determined that common questions were predominant because, although "the class members' particular experiences may vary to some degree," any such variance

went to the existence and quantum of damages, whereas liability issues relied on "common questions inherent in Plaintiffs' Eighth Amendment claims . . . ." A.11-12.

## SUMMARY OF THE ARGUMENT

Appellants challenge only the district court's finding that Plaintiffs established commonality, typicality, and predominance. Their arguments fail.

The district court did not abuse its discretion in finding that Plaintiffs' evidence established the existence of common questions that can be answered on a class-wide basis that will drive the case's resolution. Plaintiffs contend that Appellants crafted a plan to conduct shakedowns that were intended to inflict unnecessary pain and humiliation without any legitimate penological justification, in violation of the Eighth Amendment. There is no dispute that Appellants created and supervised a uniform plan for the shakedowns, no dispute that the plan was uniformly executed, and no dispute as to several aspects of the plan. And while there are disputes over other aspects, and over the plan's overall constitutionality, those issues can be resolved on a class-wide basis, which will in turn establish or disprove Appellants' liability as to the class as a whole.

Appellants argue that Plaintiffs' evidence is numerically insufficient to establish commonality. This argument is forfeited, but also wrong. Since Appellants admit that there was a common plan—and merely dispute what the plan was—there is no deficiency in the number of Plaintiffs' "anecdotal" accounts of the shakedowns. Moreover, Appellants' numerical sufficiency argument fails to credit Plaintiffs' evidence from more than 300 tact team members that there was a uniform

shakedown plan that was uniformly followed, or that Plaintiffs' evidence from 108 class members shed light on the experience of many class members beyond themselves. And Appellants' argument that inconsistencies in the class member accounts defeats commonality focuses on irrelevant details and is not borne out by the factual record.

Appellants' typicality arguments overlap entirely with commonality, and fail for the same reasons. Finally, the district court did not abuse its discretion in finding that Plaintiffs' evidence established the common questions were predominant. Appellants' constitutional liability centers not on particular actions they took toward individual class members during the shakedowns, but rather on the actions they took to craft the shakedown plan and direct members of the tact team to follow it. The questions about the precise counters of that plan, and its constitutionality, predominate over any individualized issues.

Appellants argue that section 1983's personal involvement requirement precludes any finding of predominance, but this argument misconstrues the case law of supervisory liability and misconstrues the nature of Plaintiffs' liability theories against them. Appellants also contend that the individualized nature of class members' damages precludes predominance, but this ignores extensive precedent that certifying a liability class and leaving individualized damages questions for future proceedings is entirely appropriate.

## STANDARD OF REVIEW

To obtain class certification, the moving party must demonstrate that the proposed class satisfies the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure—numerosity, commonality, typicality, and adequacy of representation—and that one of the requirements of Rule 23(b) is met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018). In this case, Plaintiffs sought certification of a Rule 23(b)(3) class, which allows for class certification "when questions of law or fact common to the class predominate over any questions affecting individual members and when a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015) (citing Fed. R. Civ. P. 23(b)(3)) (internal quotation marks omitted).

This Court reviews a district court's class certification decision for an abuse of discretion. *Lacy v. Cook Cnty.*, 897 F.3d 847, 863 (7th Cir. 2018). "District courts have broad discretion to determine whether certification of a class-action lawsuit is appropriate[,]" *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 859 (7th Cir. 2017), and are appropriately given "substantial latitude in management of complex class-action litigation." *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 888 (7th Cir. 2011). This Court's review is demanding, but it is also deferential. *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020). This Court will accordingly set aside a class certification decision only if it the district court "commits legal error or makes clearly erroneous factual findings." C*hicago Teachers Union v. Bd. of Educ. of City of*

*Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). "A finding is considered clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Graber v. Clarke*, 763 F.3d 888, 894 (7th Cir. 2014) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## ARGUMENT

The district court in this case determined that Plaintiffs had satisfied each of Rule 23(a)'s four threshold requirements and had additionally met Rule 23(b)(3)'s predominance and superiority requirements. A.6-12. On appeal, Appellants challenge only the district court's finding that Plaintiffs had established commonality, typicality, and predominance.

## I. The District Court Properly Determined that Common Questions Susceptible to Resolution on a Classwide Basis Existed.

Rule 23(a)(2) requires a proposed class to present questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2). The Supreme Court in *Wal-Mart* made clear that, for purposes of Rule 23(a)(2), what matters is not simply the creation of common questions, but "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. at 350 (emphasis in original); see also *Chicago Teachers Union*, 797 F.3d at 434.

In assessing commonality, the district court must determine whether the evidence (beyond the pleadings alone) establishes that the case presents common questions that can be answered on a class-wide basis in a way that will drive the case's resolution. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th

Cir. 2012). And although that inquiry will typically involve some overlap with the merits of the case, district courts are not permitted to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); see also *Messner*, 669 F.3d at 811 ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits"). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.*, 568 U.S. at 466. Surety of prevailing on the merits is *not* required to satisfy Rule 23, and commonality only requires the presence of common questions that can be resolved on a class-wide basis—not that those questions will be resolved in the class's favor. *Amgen Inc.*, 568 U.S. at 459-60; *Bennett v. Dart*, 953 F.3d 467, 469 (7th Cir. 2020) ("Classes can lose as well as win.").

Commonality must be addressed with reference to the merits of the class's claims. *McFields v. Dart*, 982 F.3d 511, 516 (7th Cir. 2020). In this case, the class asked the district court to certify three constitutional claims: (1) that Appellants designed and implemented a plan to conduct abusive and humiliating shakedowns that did not further any legitimate penological purpose, in violation of class members' Eighth Amendment rights; (2) that Appellants reached an agreement to violate class members' constitutional rights; and (3) that Appellants knew that their plan would violate class members' Eighth Amendment rights, and did nothing to intervene to prevent these constitutional violations. R.481 at 23. At the heart of each of these claims is the contention that Appellants crafted a plan to conduct shakedowns that

were intended to inflict unnecessary pain and humiliation without any legitimate penological justification, in violation of the Eighth Amendment. *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (searches violate the Eighth Amendment when they are "conducted in a harassing manner intended to humiliate and cause psychological pain"); *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003) (searches conducted in a manner that has no legitimate penological justification violate the Eighth Amendment). The conspiracy claims further require the class to establish that the Appellants reached an agreement to violate class members' Eighth Amendment rights and each took action in furtherance of that agreement. *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988). Finally, the failure-to-intervene claims require additional proof that the Appellants had the opportunity to intervene to prevent the violation of class members' Eighth Amendment rights. *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016).

## A. Establishing Commonality Did Not Require Plaintiffs to Prove Their Success on the Merits of Their Claims.

The district court determined that Plaintiffs' evidence established that Appellants crafted a plan to conduct shakedowns in uniform fashion at Menard, Illinois River, Big Muddy River, and Lawrence, and closely supervised the execution of their plan. A.2-4. In making this determination, the district court cited several of the Appellants' own admissions, and noted that Appellants themselves had conceded that the shakedowns had been executed according to their plan. A.4 ("Defendants agree that the shakedowns occurred as planned."). The district court determined that this evidence raised common questions about the contents of that admittedly uniform

plan, whether that uniform plan constituted cruel and unusual punishment, and whether Appellants personally approved and facilitated, or turned a blind eye, to the abusive and unconstitutional shakedowns. A.7. The district court noted that Appellants had disputed certain aspects of the contents of the uniform plan, and had argued that there were inconsistencies in Plaintiffs' evidence about the precise contours of the shakedowns, but found that even taking this evidence into account, "there [was] sufficient evidence of a common set of operative facts demonstrating uniform conduct towards members of the class." A.8.

The district court was well within its discretion to find that Plaintiffs had satisfied Rule 23(a)(2)'s commonality requirement. This Court has repeatedly emphasized that "[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014); see also *Chicago Teachers Union*, 797 F.3d at 438 (actions taken by subordinates "can be the source of a common claim if they are, for example, the outcome of . . . practices or policies controlled by higher-level directors"). There is no dispute that Appellants—supervisors who created and supervised the uniform execution of the shakedown plan—engaged in the same conduct with respect to each class member. Indeed, Appellants have repeatedly admitted as such. R.491 at 14; Br. at 7-9. The dispute between the parties instead focuses on some of the details of that plan and on the plan's ultimate constitutionality. Br. at 7-9 (describing Appellants' version of the plan). But the answers to those disputed questions—whether they are answered in

favor of the class, or in favor of the Appellants—will be adjudicated on a class-wide basis and will resolve the Appellants' liability to the class as a whole.

Take, for example, Appellants' contention that "the evidence shows that at worst the non-supervisory [IDOC staff]"—i.e., *not* the Appellants against whom the class has been certified—"departed from the policy set by supervisors," and committed constitutional violations on an individualized basis. Br. at 33. If Appellants' contention is correct, then the Appellants are entitled to summary judgment or a verdict in their favor as to the class as a *whole*. See, e.g., *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869-70 (7th Cir. 2011) (supervisors can be held liable under section 1983 for actions of a subordinate only if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see"). If the Court or a jury instead believes that Plaintiffs have provided sufficient evidence to conclude that Appellants' admittedly uniform shakedown plan was abusive and humiliating by design, and resulted in the violation of class members' constitutional rights, then Appellants are liable to the class as a *whole*. See *Amgen Inc.*, 568 U.S. at 460 (plaintiffs not required to *prove* an element of their claim in order to obtain class certification, but rather to demonstrate that the class "will prevail or fail in unison").

The district court recognized this when it held that Appellants' arguments against class certification addressed "the merits of Plaintiffs' claims rather than the sufficiency of the bases for class certification." A.7. Appellants argue that this was an abuse of discretion because a policy can only form the basis of a common question

when it is undisputed, or when the class *proves* that the contents of the policy exist as they contend. Br. at 21. But that argument is contrary to this Court's precedents.

In *Bell*, this Court rejected precisely the same argument Appellants raise here. The class in *Bell* contended that the defendant maintained a policy that required class members to work overtime without pay. 800 F.3d at 371. The defendant disputed that it had any such policy, instead contending that its policy was to pay overtime as required by law. *Id.* On appeal, the defendant argued that class certification was improper unless the class could offer proof that the policy existed as they contended. *Id.* at 374. This Court rejected that argument, finding that "such proof is not required, only that it is *capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Id.* at 375 (internal quotation marks omitted);[12] see also *Beaton*, 907 F.3d at 1026 (finding commonality "easily satisfied" despite the defendant's dispute about the answers to the common questions, because those questions were "amenable to class-wide resolution"); *Costello v. BeavEx., Inc.*, 810 F.3d 1045, 1060 (7th Cir. 2016).

In this case, the question of Appellants' creation of a plan to perform abusive and humiliating shakedowns and their role in supervising those shakedowns rest entirely on proof that, at trial, will be common to the class as a whole. Testimony from

---

[12] Appellants contend that the Seventh Circuit in *Bell* based its commonality determination on a finding that the plaintiffs had sufficiently proven the existence of the disputed illegal policy. Br. at 25. But when read in context, it is clear that *Bell* addressed the evidence of the policy only insofar as it was necessary to establish that the case did not present a scenario where "low-level managers use their given discretion to make individual decisions without guidance from an overarching company policy." 800 F.3d at 375. Appellants have expressly disavowed any such contention in this case.

multiple class members, with no connection to one another, that they were subjected to the same general conduct by hundreds of different IDOC employees supports Plaintiffs' contention that the shakedown plan devised by Appellants was intended to humiliate class members as a whole. *Calhoun*, 319 F.3d at 939; see also *Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (defendant can be held liable under the Eighth Amendment even if the defendants' subjective intent is not targeted toward an individual, identified prisoner). For the same reason, Appellants' testimony that the shakedown plans contained only conduct that was justified by a legitimate penological purpose would be relevant because it would tend to preclude liability for Appellants to the class as a whole. *Backes*, 662 F.3d at 870. Because the individuals against whom the class was certified were the creators of the plan, rather than the individuals who conducted the shakedowns pursuant to that plan (who could be held liable even if the shakedown plan itself was found to be constitutional), the relevant evidence about the shakedowns, and the conversations and planning that occurred in advance, is relevant to each member of the class in the same way.

Appellants do not dispute that the question of the contents of their shakedown plan, which they admitted remained uniform throughout the shakedowns at issue in this case, could be established or disproven through evidence that would apply to the class as a whole. They do not, for example, claim that the decision about *how* to order class members to march, or to perform other aspects of the shakedown, was left to the discretion of individual tact team members, potentially rendering evidence of one day's shakedown irrelevant to the question of what happened during the next day.

See Br. at 7-9; see also *Wal-Mart*, 564 U.S. at 355-56. Instead, they argue that Plaintiffs' evidence was numerically insufficient and too inconsistent to ultimately prevail on their claims for liability against them. As explained in greater detail below, Appellants' attack on Plaintiffs' accounts is incorrect and misleading. See *infra* pg. 33-35. But for purposes of commonality, the attack is also irrelevant—the undisputed evidence establishes that the shakedowns at issue were planned and executed by Appellants in common fashion and thus Plaintiffs' claims about the content and constitutionality of Appellants' plan will prevail or fail in unison. *Amgen Inc.*, 568 U.S. at 460.

In this case, there is clear and undisputed evidence that a common plan created by Appellants existed, that this plan governed each aspect of the shakedown, and that the plan was consistently followed by each member of the tact team. Appellants admitted this. Members of the tact team themselves admitted this. And the testimony from class members indicates that the conduct they observed was applied equally to other prisoners within their field of vision or hearing. The contents of that plan, the penological purpose of that plan, and Appellants' intent to use that plan to inflict abuse and humiliation on class members are thus common questions whose answers will substantially resolve the class's claims as a whole.

Given this evidence, the district court acted well within its discretion in finding that Plaintiffs had established commonality. No further inquiry into how the district court would resolve the answers to those questions was necessary or even allowed.

And this Court similarly need engage in no further inquiry in order to affirm the district court's commonality determination.

**B.** **Plaintiffs Have Presented Substantial Evidence that the Common Plan Crafted by Appellants Existed as They Contend.**

Even if this Court determines that the class was required to prove that the common plan created by Appellants existed as they claim, Plaintiffs provided more than enough evidence to meet this burden. "Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements, but they need not make that showing to a degree of absolute certainty." *Messner*, 669 F.3d at 811. The district court may grant class certification instead if Rule 23's requirements have been established "by a preponderance of the evidence." *Id.*

Appellants concede that they created a common plan and supervised its execution in uniform fashion. And they concede that the plan contained several of the details alleged by Plaintiffs. Appellants argue, however, that Plaintiffs have failed to establish other disputed details of the plan because they have not provided a sufficiently large number of accounts from class members compared to the size of the total class, and because the accounts are too inconsistent. Appellants' numerical quantity argument fails because Appellants forfeited it by failing to raise it below. Even on the merits, Appellants' arguments about the numerical sufficiency and the alleged inconsistency of class member accounts fail.

### 1. Appellants Forfeited their Numerical Sufficiency Argument by Failing to Present it to the District Court.

In response to Plaintiffs' motion for class certification, Appellants argued to the district court that Plaintiffs failed to demonstrate an unconstitutional policy and instead presented only "conflicting testimony of the Plaintiffs and putative class members as to what happened during the shakedown." R.491 at 17. But Appellants never argued the theory they now raise—that "[w]here plaintiffs proceed with anecdotal evidence of a policy, courts should compare the size of the proposed class to the number of members about whom they presented evidence." Br. at 22.

This Court has repeatedly held that "a person waives an argument by failing to make it before the district court." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); see also *CNH Indus. Am. LLC v. Jones Lang LaSalle Americas, Inc*, 882 F.3d 692, 705 (7th Cir. 2018). That is especially true in a case like this one, where the Court reviews a decision for an abuse of discretion, because the appellate court must "consider the reasons for [the lower] court's decision and in turn what was argued and presented to the district court by the parties" without permitting the parties to raise arguments or evidence not presented to the district court for consideration. *Packer v. Trustees of Indiana Univ. Sch. of Med.*, 800 F.3d 843, 848-49 (7th Cir. 2015).

Appellants' argument that first-hand accounts of a policy is valid only if it reaches some large numerical quotient of class member accounts is forfeited. Appellants "had a full and fair opportunity to raise this issue" to the district court, "but failed to do so." *Cranberry Growers Coop. v. Layng*, 930 F.3d 844, 854 (7th Cir. 2019). This new theory is not just a reframing or extension of Appellants' original

argument, since their argument to the district court centered on the *quality* of Plaintiffs' evidence rather than its sufficient *quantity*. *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1009 (7th Cir. 2018). Appellants never argued to the district court that there was some minimum number or numerical quotient required to establish class certification, or that Plaintiffs had failed to achieve it, and they cannot now argue that the district court abused its discretion for failing to reject class certification on this basis. Appellants have forfeited this argument and this Court need not consider it.

     **2.**     **Plaintiffs Submitted Substantial Evidence of Uniformly Abusive and Humiliating Shakedowns Planned by Appellants.**

Even on their merits, Appellants' arguments against the quantity and quality of Plaintiffs' evidence fail. First, Appellants contend that there is a rule requiring a minimum percentage or quotient of class members who must submit testimony in order to meet Rule 23(a)(2)'s commonality requirement. See Br. at 22-23. In support of their argument, Appellants rely on *Wal-Mart*,[13] where the Supreme Court reversed certification of a 1.5-million member class of employees who alleged discrimination. 564 U.S. at 343. The Supreme Court found commonality lacking because the company gave managers at each of the 3,400 stores broad discretion over decisions relating to

---

[13] Appellants also contend this Court's decision in *Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481 (7th Cir. 2012), supports their argument. But the Court in *Jamie S.* did not address whether Rule 23(a)(2)'s commonality requirement mandated a minimum percentage of evidence from class members whatsoever. Instead, the Court found that an expert's conclusions about the defendant's liability based on a review of certain student files could not on its own justify the district court's finding of liability on the *merits* of the class's claims.

employment and compensation, and there was no evidence that the corporation itself had imposed any overarching policy that had caused discrimination in any particular employment decision. *Id.* at 351. Without any other evidence to establish a national policy, the Court in *Wal-Mart* determined that "120 affidavits reporting experiences of discrimination" on its own was insufficient to raise an inference that discrimination suffered by 1.5 million class members was the result of common policy. *Wal-Mart*, 564 U.S. at 358; see also *id.* at 359 (even if the 120 affidavits were fully credited, they failed to establish a companywide policy that commonly resolved the question of *why* class members faced discrimination).

But unlike in *Wal-Mart*, in this case Plaintiffs' evidence of commonality did not rely on testimony from class members alone. Instead, it included admissions from Appellants that certain aspects of the shakedown were part of their common plan. And it included statements from more than 300 tact members who reported that their own conduct, and the conduct of every tact member that they saw, was uniform. R.481-48; R.481-49; R.481-50; see also R.481-88 at 2-17. Given this wealth of evidence, the district court acted well within its discretion in concluding that "there [was] sufficient evidence of a common set of operative facts demonstrating uniform conduct towards members of the class." A.8.

Additionally, the 108 accounts from class members did not describe conduct that was limited to the class member alone. To the contrary, the statements from each class member that were submitted to the district court established that the conduct they experienced was applied in uniform fashion to all class members that

they could see or hear. Class members testified, for example, that the orders to form a line so close that there was physical contact with the genitals and other body parts of class members were announced to the whole group being searched. Class members also stated that tact team members shouted vulgarities like "get motherfucking naked!" loudly for many to hear. And class members uniformly stated that the orders given in the common area of the prison where they were held while their cellhouse was searched were similarly yelled to all individuals in the area.

In other words, unlike the evidence in *Wal-Mart*, the evidence from class members in this case does not speak to the experience of the members submitting the evidence alone. Instead, each piece of evidence discusses conduct that was aimed at 2 to approximately 40 individuals, depending on the particular aspect of the shakedown. See *Suchanek*, 764 F.3d at 756 (The "critical point" for commonality is "the need for *conduct* common to members of the class."). Such evidence—amounting to testimony about the treatment of as many as 4,360 class members, or nearly one-half of the class—is easily numerical sufficient to establish that the shakedown plan crafted by Appellants contained the details asserted by Plaintiffs.

Appellants' insistence that noses must be counted to establish commonality is not only unnecessary at the class certification stage, it is unnecessary to prevail at trial. Seventh Cir. Pattern Civil Jury Instr. No. 1.17 ("You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses."). As described above, there was a wealth of evidence on which the district court was

entitled to rely when it determined that there was sufficient evidence of common questions whose classwide answers would drive resolution of the case. Accordingly, even if this Court finds that Plaintiffs were required to provide "substantial evidence" of the contents of the plan they contend existed, which it should not, the Plaintiffs easily surpassed this burden.

### 3. Plaintiffs' Firsthand Descriptions of the Shakedowns Yield a Consistent Account of an Abusive and Humiliating Operation that was Uniformly Executed According Appellants' Plan.

Appellants next contend that Plaintiffs' evidence must be found legally insufficient because of alleged inconsistencies in their accounts of the shakedowns. Br. at 23-26. This argument is an unpersuasive attempt to distract from the relevant legal issues with a myopic focus on factual issues that have no relevance to the actual claims and disputes in the case, or factual issues where the divergences claimed by Appellants vanish with the slightest scrutiny.

First, Appellants fail to acknowledge that the district court expressly acknowledged considered their claimed inconsistencies, A.8, and was well within its discretion to conclude that they did not overcome Plaintiffs' extensive evidence of commonality. See *Spano v. The Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011) ("Rule 23(a)(2) does not demand that every member of the class have an identical claim."). Appellants attempt to impute some legal error to the district court by arguing that it failed to "conduct[] the requisite 'rigorous analysis'" of Plaintiffs' evidence of commonality, Br. at 25, and that it instead credited Plaintiffs' bare allegations in assessing commonality. *Id.* (quoting *Bell*, 800 F.3d at 377).

But the district court did no such thing. Although the court did use the word "allege" at times in its opinion, A.7, a review of the opinion in context makes it clear that the Court used this word to indicate that it was resolving factual disputes only insofar as it was necessary to determine class certification, and no further. Such an approach was both appropriate and required. *Amgen Inc.*, 568 U.S. at 466. It is evident from the district court's opinion that it grappled with the extant factual record and did not just blindly accept Plaintiff's unsupported assertions. See, e.g., A.8 (referencing the "sworn statements submitted on Plaintiffs' behalf"). And the district court expressly considered Appellants' argument that the "sworn statements and transcripts of unsworn interviews indicat[e] that some inmates did not remember or did not experience one or more of these alleged events," but simply concluded that, taking the record as a whole, "there is sufficient evidence of a common set of operative facts demonstrating uniform conduct towards members of the class." *Id.* (citing *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). Appellants offer nothing that suggests it was an abuse of discretion to find "sufficient evidence of a common set of operative facts"—a fact-intensive inquiry where the district court's discretion, and this Court's deference on appeal, is at its zenith. fact-intensive inquiries are an area where the appellate court's. See *Orr*, 953 F.3d at 498 ("Although others may have seen things differently, the district court was also within bounds when it found that the commonality requirement was satisfied for both classes.").

Second, even if this Court were to accept Appellants' invitation to second-guess the district court's exercise of discretion and examine the contours and purported

inconsistencies of each class member's account in microscopic detail, the inexorable conclusion would be that the class members' accounts of the shakedown are remarkably consistent, and the claimed inconsistencies are a mirage.

By and large, Appellants seek to draw the Court's attention to sideshows that do nothing more than distract from the relevant issues. For example, Appellants describe alleged "inconsistencies" in the duration for which class members were forced to wait in uncomfortable stress positions while their cells were searched, meticulously sorting the record evidence into those accounts which described the wait as "more than an hour," or "less than 2 hours," or "2-3 hours," or longer. Br. at 11-12. But they give the game away when they acknowledge these were times that the witnesses "estimated." *Id*. at 12. It is hardly surprising that, held in a painful position for an extended period with no watch or clock to refer to, the class members' time estimates diverged. Moreover, no doubt the exact duration of time spent in the holding area *did vary* somewhat between days of the shakedown, depending on how quickly the cells were searched. But this offers precisely nothing to contradict Plaintiffs' evidence that this aspect of the shakedown—forcing class members into stress positions in a holding area for a lengthy period—flowed from Appellants' common plan.[14]

Appellants' quibbles with the state of the record on handcuffing are similarly misplaced. They have carefully parsed class members' accounts and highlight those

---

[14] Similarly, it does nothing to defeat Plaintiffs' evidence of a common plan to point out that, in two of the prisons the chosen stress position required class members to stand up, head pressed against the wall, and in the other two to sit down, head pressed against the tabletop. Br. at 12.

where the witness did not explicitly describe the handcuffs as being painfully tight. Br. at 9-10. But any divergences that exist in how the cuffing was subjectively described are completely irrelevant, since Appellants concede that requiring rear-cuffing for the duration of the shakedowns—in a position which ample evidence shows was more painful than normal cuffing protocols—was part of their uniform plan, and so the (indisputably common) question is whether that rear-cuffing had a legitimate penological purpose, or instead was part of an unconstitutional scheme to abuse and humiliate class members.

Appellants' recitation of the 'inconsistencies in the evidence' is also notable for how little evidence of inconsistencies it actually reveals. By and large, it consists not of affirmative evidence of inconsistency, but simply of omissions—that is, some large number of class members' accounts describe a certain feature of the shakedowns, which some smaller number of the accounts does not mention and thus serves to neither corroborate nor dispute—as Appellants candidly acknowledge, noting facts which certain class members simply "did not report" or "did not include" or "did not describe." Br. at 9-12. For example, they charge that it was an abuse of discretion to fail to credit, and seek decertification of the class on the basis of, their identification of 34 class members who "did not report genital contact" during the line movement from the housing unit to the holding area. Br. at 10-11, n.7.[15] Notably, and despite

---

[15] Illustrating how far they have to reach to dredge up purported inconsistencies, Appellants try to conjure up divergence by pointing out that only a subset of class members describe the tact team using the phrase "nuts to butts", Br. at 10-11—but of course these are not talismanic words central to Plaintiffs' alleged unconstitutional shakedown plan, they are merely one piece of evidence in support of the broader point that the line movement was

having every incentive to do so, they point to not a single prisoner who affirmatively denies experiencing genital contact in a way that casts any doubt on the existence of a common plan.[16] For 4 of the 34, they are just wrong—these class members *do* affirmatively describe genital contact.[17] The remainder all arise from defense counsel's unsworn interviews with class members—where they had unilateral control over the questioning, and simply chose not to ask a clear question about whether there was genital contact.[18] And it is a similar picture for Appellants claimed inconsistencies on the reverse strip searches. Again, they trot out the misleading example of a prisoner in wheelchair who was strip searched differently.[19] And again, they amplify omissions in the record, primarily of their own making, while failing to offer any compelling showing of actual affirmative inconsistency.

Appellants scrape the bottom of the proverbial barrel to gin up alleged inconsistencies, but their issues are irrelevant distractions, or fail to survive close scrutiny of the factual record (or both). In any event, the district court considered and

---

designed to occur in an uncomfortable and humiliating way with no legitimate purpose, a contention which *none* of the class members' accounts contradict.

[16] At most, they have two highly misleading examples which cast no doubt on the common plan: one, a prisoner in a wheelchair who, as a result, was not forced to march like the others, prisoners, but whose testimony supports the existence of the plan Plaintiffs describe, R.481-35 at 22, 35-36, 66-67, and the other, a prisoner held on suicide watch in an isolation cell who was not marched in the mass line movement at all, R.491-7 at 77-78.

[17] See R.481-39 at 15:10-12; R.481-32 at 34:21-36:4; R.491-7 at 19, 29.

[18] Notably, most of these accounts describe close physical contact during the line movement, R.491-7 at R.491-7 at 6-8, 47-51, 81-83, 86-88, 91-93, 96-99, 121-22, 133-35, 150-54, 156-58, 161-63, 166-68, 171-73, 176-79, 187-88, 191-93, 196-98, 206-09, 212-13, which is entirely consistent with Plaintiffs' articulation of uniform plan for the shakedowns.

[19] R. 481-35 at 22:2-16, 45:1-46:8.

rejected these contentions. These are simply not the sort of issues that rise to the level of an abuse of discretion requiring de-certification.

## II. Plaintiffs Satisfied Rule 23(a)(3)'s Typicality Requirement.

As a predicate for certification, Rule 23(a)(3) requires plaintiffs to demonstrate that the claims of the proposed class representatives are typical of the claims of the class as a whole. Fed. R. Civ. P. 23(a)(3). A class representative's "claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and [his] claims are based on the same legal theory." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)) (cleaned up). Identical experiences are not required; there need only be "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). The named representatives' claims need only "have the same essential characteristics as the claims of the class at large." *Lacy*, 897 F.3d at 866 (quoting *Oshana*, 472 F.3d at 514).

Here, the district court found that the evidence of the class representatives' experiences during the shakedowns was sufficiently similar to the other class members' experiences—as established both by evidence from those class members and Appellants' own admissions about the shakedowns—to meet Rule 23(a)(3)'s typicality requirement. A.8-9. The district court specifically found that "while not identical," the class representatives' claims were "typical of the class," noting that the

evidence showed that, "during uniformly executed shakedowns," both the class representative and the putative class members were "subjected to humiliating and unsanitary strip searches and line movements," "uncomfortable and painful handcuffing," and "extended hours of uncomfortable standing or sitting[,] in violation of the Eighth Amendment." A.9.

Far from an abuse of discretion, this finding was well-supported by the factual record. Plaintiffs' motion for class certification discussed in detail the shakedown experiences of the five class representatives—Jonathan Tolliver and Ronald Smith (both incarcerated at Menard), Demetrius Ross (incarcerated at Illinois River), Kevin Hamilton (incarcerated at Big Muddy River), and Glenn Verser (incarcerated at Lawrence). R.481 at 17-21. Each of the five class representatives testified that they heard tact team officers yelling loudly and banging their batons as they entered the housing units where the men lived. R.481-29 at 45:21-46:3; R.481-30 at 38:11-39:5; R.481-31 at 43:14-44:7; R.481-32 at 41:5-19; R.481-33 at 68:8-12. Each of the class representatives testified that one of the tact team officers then approached his cell and ordered him to perform a reverse strip search. R.481-29 at 48:17-52:13; R.481-30 at 41:11-43:3; R.481-31 at 56:14-57:5; R.481-32 at 58:7-22; R.481-33 at 74:19-24. Afterward, each representative testified that he was ordered to dress himself without underwear. R.481-29 at 55:6-13; R.481-92 at 6; R.481-31 at 56:14-57:5; R.481-32 at 59:23-60:6; R.481-33 at 75:24-76:4. Each class representative was then handcuffed behind his back with his palms facing outward and his thumbs pointed upward.

R.481-29 at 57:22-58:7; R.481-30 at 46:15-19; R.481-31 at 60:16-61:6; R.481-32 at 63:23-64:3; R.481-33 at 100:4-8.

Each of the men testified that they were then ordered to form a line with other class members in such close formation that their genitals made contact with the man ahead of him in line, and the man behind in line made similar contact with his backside. R.481-29 at 68:12-70:22, 76:18-22; R.481-30 at 48:14-50:23; R.481-31 at 75:12-78:16, 81:11-22; R.481-32 at 66:17-67:14, 71:17-22, 74:17-21; R.481-33 at 64:22-67:9, 88:1-89:9, 93:4-17, 94:7-97:15. Smith, Ross, Hamilton, and Verser testified that they heard tact team officers expressly order the line of men to line up "nuts to butts," while Tolliver testified that the order he heard was that there was "too much daylight," although the effect of the order was the same. R.481-29 at 68:12-70:21; R.481-30 at 50:14-23; R.481-31 at 75:12-77:8, 81:11-22; R.481-32 at 66:17-67:14; R.481-33 at 62:1-65:9. During the march from their housing unit to a common area within the prison, each class representative testified that a member of the tact team used force against him to force him to make contact with one or more body parts with the man ahead of him in line. R.481-29 at 68:12-70:21; R.481-30 at 28:13-24, 56:5-57:24; R.481-31 at 69:13-71:17, 80:8-23; R.481-32 at 74:14-76:15; R.481-33 at 88:1-89:9, 93:4-17.

While in the common area, each of the class representatives testified that they were ordered to sit or stand while keeping their heads down. R.481-29 at 79:15-19, 81:3-5, 84:21-86:16; R.481-30 at 62:2-21, 69:12-14; R.481-31 at 102:18-21; R.481-32 at 77:19-78:14; R.481-33 at 111:14-112:4. Because of they way they had been ordered to

stand or sit, they were not able to look at a clock (even if one was available) to know precisely how long they remained in the common area, but the class representatives estimated that they were in the common area for approximately 2-4 hours. R.481-29 at 92:3-11; R.481-30 at 62:2-21; R.481-31 at 102:18-21; R.481-32 at 78:7-81:9; R.481-33 at 115:15-16. They were then marched back to their housing unit in the same close formation with their bodies making physical contact with other class members in the line. R.481-29 at 97:1-98:5; R.481-30 at 76:22-77:4; R.481-31 at 111:16-19; R.481-32 at 83:3-84:15; R.481-33 at 117:22-119:12.

Appellants' typicality arguments overlap entirely with their challenge to the district court's findings on commonality. Br. at 27-28. This is unsurprising, since Rule 23(a)'s "commonality and typicality requirements . . . tend to merge." *Wal-Mart*, 564 U.S. at 350, n.5. However, as discussed above, since Appellants' commonality arguments lack merit, their typicality arguments are likewise doomed. They repeat their unfounded charge that the district court improperly relied on allegations and not evidence, but their only basis for this claim is the court's at-worst-inartful turn of phrase that each class representative "alleges" that they were treated improperly in a similar fashion to the class. Br. at 27. But as detailed above, there is ample *evidence*—in the form of deposition testimony, sworn statements, and the other materials submitted in support of Plaintiffs' class certification motion—supporting the district court's findings.

Appellants regurgitate their unfounded arguments that Plaintiffs' evidence was numerically insufficient, and that the record revealed too many inconsistencies.

Just as these arguments fail on the commonality prong, so too here. Appellants' numerical sufficiency contention fails to credit the extensive evidence, including their own admissions and the statements of other Defendants who served as line-level tact team members, that the shakedowns arose from a uniform plan that was carried out uniformly. And, as discussed above, their inconsistencies are a red herring, focusing on irrelevant issues and failing to withstand factual scrutiny. There is no basis to disturb the district court's well-supported findings of typicality.

## III. The Common Questions Predominate Over Individualized Issues.

The focus of Rule 23(b)(3) is to ensure that courts "select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc.*, 568 U.S. at 460 (internal quotation marks omitted); see also *Chicago Teachers Union*, 797 F.3d at 433 ("The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on her own."). Rule 23(b)(3) allows for certification when "questions of law or fact common to the class members predominate over any questions affecting individual members" and "when a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Beaton*, 907 F.3d at 1029. To assess predominance courts must "ask[] whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v.*

*Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citation omitted). Individual questions are those that require members of a class "to present evidence that varies from member to member," whereas common questions are those "susceptible to generalized, class-wide proof." *Id.* Predominance is satisfied "when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (cleaned up).

Predominance is not determined by simply "counting noses"; rather, it is a qualitative assessment that looks to the importance of the common questions and their ability to drive resolution of the case. *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("common issues need only predominate, not outnumber individual issues"). And like its Rule 23(a) inquiry, a court's inquiry into predominance does not permit a "free-ranging" inquiry into the merits of plaintiffs' claims. *Amgen Inc.*, 568 U.S. at 466. Rather, the court may only resolve those factual disputes that bear on the question of predominance. *Bell*, 800 F.3d at 377.

### A. The Predominant Common Questions of Appellants' Liability Will Cause the Class to Prevail or Fail in Unison.

In this case, Plaintiffs' class has been certified only against those 22 Defendants who played the central role in planning and supervising the shakedowns and only as to the constitutional claims alleged against them. R.481 at 22-23. The constitutional liability of these Defendants centers not on particular actions they took toward individual class members during the shakedowns, but rather on the actions they took to craft the shakedown plan and direct members of the tact team to follow it. *King v. McCarty*, 781 F.3d 889, 897 (7th Cir. 2015) (a search that is "motivated by

a desire to harass or humiliate rather than by a legitimate justification" violates the Eighth Amendment), *overruled on other grounds by Henry v. Hullett*, 969 F.3d 769 (7th Cir. 2020) (en banc); *Mays*, 575 F.3d at 649-50 (searches that are conducted in a "harassing manner intended to humiliate and cause psychological pain" violate the Eighth Amendment); see also *Childress v. Walker*, 787 F.3d 433, 440 (7th Cir. 2015) ("In the case of those responsible for setting policy, liability will result from the institution of a policy that, when enforced, causes a constitutional deprivation." (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1012 (7th Cir. 2000)) (cleaned up).

As Appellants note, Plaintiffs must prove Appellants' deliberate indifference to prevail. Br. at 30. But the class does not need to prove that the 22 Defendants were deliberately indifferent to each of them individually. *Farmer*, 511 U.S. at 843; see also *Childress*, 787 F.3d at 440. Rather, evidence that the deliberately indifferent to them as a group is sufficient. *Farmer*, 511 U.S. at 843. Similarly, the presence of injury (as opposed to the quantum of injury) can be determined from classwide evidence that the shakedown plan was intended to be humiliating without penological justification, and was communicated to tact team members to execute in uniform fashion. *Calhoun*, 319 F.3d at 939 ("gratuitous infliction of pain always violates contemporary standards of decency and need not produce serious injury in order to violate the Eighth Amendment").

In this case, the evidence demonstrates that the common questions identified by the district court predominate over any individual issues. As discussed above, the parties in this case agree that the 22 Defendants against whom the class was certified

crafted a common plan to perform the shakedowns, and communicated that plan to each member of the tact team responsible for executing the shakedowns. The parties further agree that the shakedowns themselves were executed consistent with the plan, and indeed, agree about multiple aspects of the shakedown plan itself. For those aspects of the shakedown plan that are disputed, Plaintiffs have provided substantial evidence that the plan in fact existed as they contend. But regardless of the jury's ultimate resolution of that dispute, the contents of the plan and the determination about whether it was designed to humiliate class members or instead designed to effectuate a legitimate penological purpose will resolve the question of liability for these 22 Defendants in one proceeding, without the need to rely on, or even refer to, individualized evidence that differs between each class member. See *Bell*, 800 F.3d at 378 (finding predominance satisfied because the answers to the common questions would resolve the class's claims "in unison[,]" even if individuals may have claims that remain against other defendants based on a different legal theory).

If, for example, the jury determined that the Appellants' shakedown plan was not created to humiliate class members and was instead justified by a legitimate penological interest, the fact that a particular class member nevertheless suffered an egregious use of force by an individual tact team officer would have no bearing on their liability. See *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent."). Similarly, if the jury determined that the Appellants' shakedown plan was

created to humiliated class members without legitimate penological justification, an aberrant act by a tact team member that was not part of that plan would not absolve them, even if might affect the particular quantum of damages to which that class member was entitled. *Calhoun*, 319 F.3d at 939.

Appellants reiterate their contention that certain aspects of the class members' accounts of the shakedowns vary. Br. at 30. As discussed above, this argument is meritless. See *supra*, pg. 34-38. But even if true, such a contention would not defeat predominance, but instead support their assertion that their shakedown plan was as they contend, was justified by a legitimate penological purpose, and entitle them to judgment in their favor on the class's claims as a whole. *Amgen Inc.*, 568 U.S. at 460. Here, Plaintiffs presented evidence that Appellants created and effectuated a uniform policy, the result of which rose to the level of an Eighth Amendment violation. And as discussed in detail above, these questions are common because they will be answered with class-wide evidence that applies to all class members equally to determine the aspects of the shakedown plan created by Appellants, as well as Appellants' intent in creating and effectuating it, permitting a jury to resolve Appellants' liability to the class as a whole in a single proceeding. See *Kleen Prods. LLC*, 831 F.3d at 927 (finding that circumstantial evidence offered to prove existence of conspiracy was common to the class); *Butler*, 727 F.3d at 799 (pointing out that where a favorable answer to common questions will defeat liability, defendants should "welcome" certification because class members would be bound by a defense verdict).

The district court acted well within its discretion when it found that the common questions it had identified would predominate over individual ones. A.7; A.10-12. In reaching its conclusion, the district court reasoned that any individualized inquiries did not defeat the importance and efficiency of resolving the principal issues in a single proceeding. The district court drew on its own substantial experience managing class actions and the wealth of precedents affirming class certification in cases involving widespread policies and procedures. A.11 (collecting cases). As the district court recognized, federal courts routinely find that common questions predominate in cases like this one that challenge the constitutionality of a policy or widespread practice. See, e.g., *Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Streeter v. Sheriff of Cook Cnty.*, 256 F.R.D. 609, 614 (N.D. Ill. 2009) ("When a proposed class challenges a uniform policy, the validity of that policy tends to be the predominant issue in the litigation."); *Young*, 2007 WL 1238920, at *7 (same); see also *Brown v. Kelly*, 609 F.3d 467, 484 (2d Cir. 2010); *Snead v. CoreCivic of Tenn., LLC,* 2018 WL 3157283, at *16-17 (M.D. Tenn. June 27, 2018); *Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013).

The district court also acted well within its discretion when it determined that Appellants' arguments against predominance attacked the merits of the class's claims but not their suitability for certification. A.11-12. Appellants repeat this mistake on appeal, raising arguments that even a single minor variation in the experience of each class member would wholly transform the constitutional claim and analysis. Br.

at 30-32. But the certified claims in this case focus on Appellants' actions in creating the shakedown plan that they directed tact team members to execute in uniform fashion, and Appellants' liability is not impacted even if a few individual tact team members varied from the common plan in some respect. The district court's determination is thus wholly in line with this Court's decision in *Bell*, which found predominance against the defendant had been satisfied notwithstanding the fact that the class members might have other claims based on other legal theories against other individuals even if the jury found that the policy alleged by the class was not unlawful. 800 F.3d at 378-79.

Appellants have failed to identify any legal error or clearly erroneous factual finding that the district court committed in finding predominance. They instead simply contend that the district court reached the wrong conclusion. Such a contention is insufficient to overcome the high degree of deference given to a district court's factual determinations. *Horne*, 557 U.S. at 493. The district court was well within its discretion to determine that common questions about Appellants' plan and execution, and their intent in creating it, would predominate over any individual questions.

## B.   Section 1983's Personal Involvement Requirement Does Not Preclude a Predominance Finding Against Appellants.

Appellants also argue that class certification is inappropriate against supervisory defendants because of 42 U.S.C. § 1983's personal involvement requirement. But they do not contend that *these* particular supervisory Appellants

present issues that defeat predominance, and instead urge a categorical rule protecting supervisory defendants from class certification in all contexts.

Such a rule finds no support in this Court's precedents. This Court has repeatedly recognized that for supervisory defendants "responsible for setting policy, liability will result from the institution of a policy that, when enforced, causes a constitutional deprivation." *Childress*, 787 F.3d at 440 (internal quotation marks omitted); see also *Backes*, 662 F.3d at 870 (supervisors who do not directly participate in the complained-of conduct may still be liable if they "know about the conduct and facilitate it, approve it, [or] condone it").

Appellants argue that the "evidence shows that at worst the non-supervisory defendants departed from the policy set by supervisors," so Plaintiffs cannot show supervisory liability on a class-wide basis. Br. at 33. But this is just another iteration of Appellants' disappointment with the district court's conclusion that Plaintiffs presented sufficient evidence of an unconstitutional policy. The parties agree that the 22 supervisory Defendants against whom this class was certified created a uniform plan and executed it uniformly. R.491 at 14. The district court acknowledged the dispute about what that uniform plan entailed, but correctly determined that whatever the answer, the common questions about the plan would "drive the resolution of the litigation" for the entire class. *Wal-Mart*, 564 U.S. at 350; A.12. Because the common questions will resolve the liability aspect of this litigation, it will also resolve any concerns about supervisory liability. Thus, the district court did not abuse its discretion in certifying a class against the supervisory Defendants.

In support of their contention that "[s]upervisory claims" are "more difficult to resolve on a classwide basis," Br. at 33, Appellants cite a single, out-of-circuit case: *Blyden v. Mancusi*, 186 F.3d 252, 271 (2d Cir. 1999). But *Blyden* offers little that is instructive here. The claims at issue in *Blyden* arose from the 1971 Attica prison riot, and the brutal acts of retaliation perpetrated against prisoners by an array of prison guards and other state officials in its aftermath.186 F.3d at 256-58. The district court had certified class-wide claims against the prison's deputy superintendent, not for his affirmative conduct but for his role in failing to prevent violent acts of retaliation, even after he had left the prison. *Id.* at 259. And after a liability trial that involved convoluted and confusing jury instructions, the trial judge further partially walked-back liability during a damages trial. *Id.* at 259-61. Faced with this procedural morass, the Second Circuit reversed the district court on a number of issues, including certification based on individualized issues present about class members who interacted with the superintendent directly, and for "acts of violence when Pfeil was present at Attica and when he was home." *Id.* at 271.

*Blyden* is night-and-day different from Plaintiffs' theory of class-wide supervisory liability here, where the parties *agree* that there was a common plan carried out uniformly. Unlike in *Blyden*, Appellants here acted affirmatively to create a uniform plan, and the constitutionality of that uniform plan is the driver of liability. In these circumstances, the district court was well within its discretion to conclude that the questions surrounding that plan were predominant.

## C.   Individual Damages Determinations Do Not Preclude Certifying a Class.

Finally, Appellants argue that if damages calculations need to be tried separately, class certification is improper. Br. at 34. Appellants also state that the district court did not determine whether there was a class-wide method of proof for damages. *Id.* This argument fails.

Supreme Court and Seventh Circuit precedents recognize that certification of a liability class is appropriate "even though other important matters will have to be tried separately, such as damages . . . ." *Tyson Foods, Inc.*, 136 S. Ct. at 1045; see also *Butler*, 727 F.3d at 800 ("[A] class action limited to determining liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members" is permissible and often "the sensible way to proceed."). In *Mulvania*, this Court recognized that federal courts were uniform on this point, calling the conclusion "well nigh universal." 850 F.3d at 859. And it rejected the district court's reasoning, which Appellants present here, that common issues did not predominate because there would be "no simple or formulaic method" to calculate damages. *Id.* Instead, this Court held that "[i]n cases like this, where damages must be assessed individually, district courts may bifurcate the case into a liability phase and a damages phase." *Id.* (internal quotation marks omitted).

It thus does not matter whether, at the damages phase, class members may be grouped into similarly situated subclasses or treated individually; so long as there are predominant common questions relating to liability, certification is appropriate. *Bell*, 800 F.3d at 379-80 (recognizing propriety of certification even where "scores of

49

separate trials might be necessary to determine which class members were actually adversely affected by the policy and if they were, what loss each class member sustained."). That is so because the class will have served its purpose in answering the predicate question: liability. *Id.*; *Chicago Teachers Union*, 797 F.3d at 442-43.

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) does not dictate a contrary result. *Comcast* was an antitrust case, involving allegedly anti-competitive corporate acquisitions by a cable company, causing alleged harm to cable subscribers in the form of inflated cable bills through four convoluted and attenuated theories, only one of which was certified by the district court. 569 U.S. at 29-31. There, the Supreme Court held that it is improper to certify a class unless the damages sought are the result of the class-wide injury. 569 U.S. at 35 ("It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."). In contrast, here "there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis[.]" *Butler*, 727 F.3d at 800. Although Plaintiffs in this case may require inmate-specific hearings to determine individual damages, because the theory of damages "match the theory of liability," i.e., that the inmates suffered an injury because of Appellants' implementation of a uniform unconstitutional shakedown policy, the district court did not abuse its discretion in deciding that common issues predominate. *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 603 (7th Cir. 2014).

In sum, the claims of each member of the class raise common questions, questions that vastly outweigh any individualized liability questions.[20] Accordingly, this court should give deference to the district court's determination that Plaintiffs satisfied Rule 23(b)(3)'s requirements.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellees respectfully request that this Court affirm the district court's class certification order.

---

[20] Although never discussed in their Rule 23(f) petition or reply, Appellants also argue that the district court abused its discretion in finding a class action to be the superior method for resolving Plaintiffs' claims. Br. at 35. For the same reasons described in this section, the district court did not abuse its discretion when it determined that a class action was the superior method by serving the economies of time, effort, and expense, and by preventing possibly inconsistent results.

Respectfully submitted,

                                        /s/ Sarah Grady
                                        *Counsel for Plaintiffs-Appellees*


Arthur Loevy
Jon Loevy
Michael Kanovitz
Sarah Grady*
Sam Heppell
Makeba Rutahindurwa
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
sarah@loevy.com

Alan Mills
Nicole Schult
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan Rd.
Chicago, IL 60640
(773) 769-1411

*Counsel of Record*

## CERTIFICATE OF COMPLIANCE

I, Sarah Grady, hereby certify that the foregoing Brief of Plaintiffs-Appellees complies with the length requirements of Federal Rule of Appellate Procedure 32(a)(7), as modified by Circuit Rule 32(c), because it contains 13,959 words, excluding the portions of the response exempted by Federal Rule of Appellate Procedure 32(f). In preparing this certificate, I relied on the word count tool of the word-processing system used to prepare the brief, Microsoft Word 365.

I further certify that the foregoing brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(c), as modified by Circuit Rule 32(b), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 12-point font, with Century Schoolbook 11-point font used for footnotes.

Respectfully submitted,

/s/ Sarah Grady
*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF COMPLIANCE WITH THIS COURT'S
ELECTRONIC CASE FILING PROCEDURE (C)(3)**

I, Sarah Grady, hereby certify that I have filed the foregoing Brief of Plaintiffs-Appellees electronically in searchable PDF format, as required by this Court's electronic case-filling procedure (c)(3).

Respectfully submitted,

/s/ Sarah Grady
*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF SERVICE

I, Sarah Grady, hereby certify that I served the foregoing Brief of Plaintiffs-Appellees on January 11, 2021, using the CM/ECF system, which effected service on all counsel of record for the Defendants-Appellants.

Respectfully submitted,

/s/ Sarah Grady
*Counsel for Plaintiffs-Appellees*